**FLOTA MARITIMA BROWNING DE CUBA, SOCIADAD ANONIMA**

v.

**THE CIUDAD DE LA HABANA, her Motors, Tackle, etc.**
and
**Banco Cubano Del Comercio Exterior.**

**No. 4096.**

United States District Court
D. Maryland.

Feb. 19, 1960.

William A. Grimes and Ober, Williams, Grimes & Stinson, Baltimore, Md., for libelant.

Robert H. Williams, Jr., and Niles, Barton, Yost & Dankmeyer, Baltimore, Md., for respondents.

THOMSEN, Chief Judge.

The amended libel of Flota Maritima Browning de Cuba, S.A., (Libelant), in rem against the motor vessel Ciudad de la Habana, her motors, tackle, etc., and in personam against Banco Cubano Del Commercio Exterior (Banco), with a clause of foreign attachment, seeks damages for the alleged breach of two lease-

purchase contracts, each of which covered several vessels. Banco and the Ciudad de la Habana have filed exceptions and exceptive allegations and a motion to decline jurisdiction, contending: (A) that the contracts are nonmaritime, and therefore this court, sitting in admiralty, has no jurisdiction over the subject matter; (B) that because of the appointment of an Interventor for Libelant by the Cuban Minister for the Recovery of Misappropriated Property, its officers had no authority to file the libel; and (C) that this court should decline jurisdiction because both of the parties are Cuban corporations and have agreed to the exclusive jurisdiction of the courts of the City of Havana.

## Facts

Respondent Banco is an autonomous credit institution, chartered under the laws of Cuba. A majority of its stock is owned by the Republic of Cuba, and it is controlled by the government. The purpose of Banco was and is to lend money and extend credit to promote Cuban trade.

An affidavit of L. D. Browning, Vice-President and Treasurer of Libelant, shows that in furtherance of its program Banco contracted for the construction of four motor ships in an English shipyard and two in a Japanese shipyard. It was originally contemplated that those vessels would be operated by the Cuban operators who were then operating five vessels already acquired by Banco, but they did not prove satisfactory. As a result, Dalpha Line, a company wholly-owned by Banco, took over the vessels from the private operators.

Banco and Dalpha Line were anxious that the vessels be operated by an experienced operator and asked a marine surveyor who had performed services for the Cuban Merchant Marine to recommend such a firm. He got in touch with T. H. Browning and L. D. Browning, operators of Browning Lines, Inc., who

thereupon entered into negotiations with Banco.

As a result of those negotiations, Libelant was incorporated as a Cuban corporation on April 8, 1958. Almost all of its stock is owned by T. H. Browning, a citizen of the United States, residing in Michigan. Its principal office is in Havana, but it also has offices in Detroit, Toronto, Montreal, and Halifax.[1]

On or about May 3, 1958, in Havana, Libelant and Banco entered into a lease-purchase contract (the English contract), which provided for the lease by Banco to Libelant of the six vessels then being constructed for Banco in English and Japanese shipyards, and contained certain provisions for the operation of the vessels by Libelant similar to those customarily contained in bareboat charters. The period of the lease was fifteen years from the delivery date of each vessel. However, the contract granted to Libelant an option to purchase the vessels and to apply against the purchase price all rental payments theretofore made, which at the end of the term would equal or exceed the agreed price, and granted to Banco the right to have the contract canceled and superseded by a contract of sale with a marine mortgage. Libelant was also entitled at any time to terminate the contract without penalty or liability, except satisfying any liens against the vessels, returning the equipment shown on the inventory, and paying any amounts then due under the contract; in such event Banco would have no right to claim from Libelant any amounts not yet due under the terms of the contract. The contract required that during the life of the charter the ships sail under the Cuban flag and have Cuban crews, and that Libelant establish service between Cuban ports and ports of the United States and Canada. It also contained a provision which has been translated as follows: "The parties hereto, waiving whatever other jurisdiction they may have by reason of any other

1. As permitted by its charter. However, under Cuban law, a Cuban corporation is required to file a certificate disclosing all branch offices, and Libelant has registered no branch office.

domicile, appoint the City of Havana and its judges and courts to take cognizance of all matters or pleadings, whether judicial or extra-judicial, that may arise from, or be a consequence of, the present contract."

Soon after the English contract was executed Browning heard that Canadian National (West Indies) Steamships, Ltd., was considering the sale of eight of its vessels which were then idle because of a strike. Browning advised Banco of the availability of those vessels. Banco expressed interest and asked Browning to make a survey of them. After that had been done, Banco determined to purchase the vessels. They were purchased by Banco in Montreal on August 19, 1958, and on the same day, in Montreal, Libelant and Banco entered into another lease-purchase contract (the Canadian contract), which provided for the lease by Banco to Libelant of the eight vessels which had just been purchased by Banco from Canadian National [2] and three other vessels, the Rios vessels, already owned by Banco.[3] It contained provisions similar to those contained in the English contract.[4]

The amended libel alleges that pursuant to the English lease-purchase contract the Steamship Pinar Del Rio was delivered to Libelant by Banco on or about October 17, 1958, and remained in Libelant's service under that contract until about January 6, 1959, when Banco wrongfully retook possession of the vessel; that Banco has refused to redeliver the vessel to Libelant and has failed and refused to perform its obligations under the contract with respect to the other

vessels covered thereby; and that Libelant has suffered $33,000 damages for "expenditures incurred in the performance of the lease provisions alone", and will suffer damages estimated at upwards of $4,000,000 "for loss of profits which would have been realized solely from the leased operation of such vessels".

The amended libel also alleges that pursuant to the Canadian lease-purchase contract the three Rios vessels were delivered by Banco to Libelant on or about September 15, 1958, and that the Ciudad de la Habana (one of the Canadian vessels, formerly known as M/S Canadian Challenger) was delivered on or about August 19, 1958; that the performance of that contract was begun and continued until breached by Banco on or about October 30, 1958; that Libelant has performed the conditions, duties and obligations imposed upon it by the Canadian lease purchase contract, but that Banco has refused and continues to refuse to perform that contract with respect to either the Ciudad de la Habana or the other vessels covered thereby; that Libelant has suffered $30,000 damages "for expenditures incurred in the performance of the lease provisions alone of the Canadian Lease-Purchase Contract with respect to the Ciudad de la Habana, and $190,000 for expenditures incurred in the performance of the lease provisions alone of such contract with respect to the other Canadian and Rios vessels, and will suffer damages for loss of profits which would have been realized solely from the leased operation of such vessels in the amount of $223,000 with respect

---

2. For a period of seven years from the date each started operating.

3. For a period of seven years from the date when such vessels were delivered.

4. The Board of Directors of Banco, in authorizing this contract, adopted the following resolution: "To purchase from the Canadian National (West Indies) Steamships Limited, for resale to Flota Maritima Browning de Cuba, S.A., eight ships * * * (f) That as a compensation for the Bank's financing of the

purchase of these ships, the Flota Maritima Browning de Cuba, S.A., purchase from the Bank under similar conditions and terms, the three ships owned by the Bank named 'Rio Damuji', 'Rio Canonao' and 'Rio Jibacoa', and that this transfer agreed to, be included in the same lease and purchase contract to be entered into with the Flota Maritima Browning de Cuba, S.A., for the purchase of the eight ships." The Board of Directors of Libelant referred to the transaction as a lease.

to the Ciudad de la Habana and $3,277,-000 and upwards with respect to the other Canadian and Rios vessels."

The Ciudad de la Habana is now in the port of Baltimore, Maryland, where it was seized and attached by the United States Marshal under process issued out of this court on June 22, 1959, pursuant to the prayers of the original libel filed herein.

Meanwhile, on January 2, 1959, as a result of a revolution led by Fidel Castro Ruz, a provisional government was proclaimed as the government of Cuba. The United States recognized this government on January 7, 1959.

On January 26, 1959, Commander Andres Gonzalez Lines, M.N., came to Libelant's office in Havana, bearing a resolution of the Minister in Charge of the Recovery of Misappropriated Property, Dr. Faustino Perez Hernandez, dated January 22, 1959, which has been translated as follows: *"Resolution: Whereas:* It is the duty of the present Government of the Republic urgently to adopt the necessary measures to facilitate the free development of work centers and to orient the economic and social activities, among which maritime transportation holds an important place. *Whereas*: From the data in possession of the Government it appears that the steamship companies entitled 'Isla De Pinos, S.A.' and 'Navegacion Dalpha, S.A.' belong to well known persons connected with the past dictatorial regime of which they were true beneficiaries, said companies having been acquired by means which are assumed to have come from misappropriations of public funds, as a consequence of which that assumption must be established in an indubitable manner. *Whereas*: To achieve the above mentioned purposes it is necessary to order the intervention of the shipping companies entitled 'Isla De Pinos, S.A.', 'Navegacion Dalpha, S.A.' and 'Browning De Cuba, S.A.' with all their vessels, offices, dependencies, tangible and intangible properties as well as their banking assets and liabilities so that they may renew their work and services as soon

as possible, and to this purpose all the officers and employees of the said companies should be placed under the administrative control of the Interventor aforementioned, whose name will be given, who may remove or substitute them freely. Therefore, in use of the power vested in me, I have resolved: First: To order the intervention of the steamship companies entitled 'Isla De Pinos, S.A.', 'Browning De Cuba, S.A.' and 'Navegacion Dalpha, S.A.' together with all their vessels, dependencies, tangible and intangible properties as well as their banking assets and liabilities; their officers and employees being placed under the administrative control of the Interventor. Second: To appoint Commander Andres Gonzales Lines, Interventor of the steamship companies entitled 'Isla De Pinos, S.A.', 'Browning De Cuba, S.A.' and 'Navegacion Dalpha, S.A.' vested with such powers and authority as may be necessary to operate on a normal basis the business of said companies and the operation of their vessels, with power to contract in court and out of court, and to enter into any kind of commercial or banking operation for the exercise of said powers and authority he may discretionally delegate in other persons, and he is likewise vested with power to remove, suspend and appoint the personnel for the better carrying out of the mission to him entrusted, informing this Ministry as soon as possible of the matters with which he has been charged."

Lines delivered the Resolution to Alfredo Cristobal Duarte y Segurola, Libelant's executive vice-president and general manager, who "rejected" the second "Whereas" clause of the Resolution and stated that Libelant (Browning de Cuba, S.A.) does not belong to "well known persons connected with the past dictatorial regime", but agreed to bring the intervention to the attention of Libelant's board of directors. Lines asked Duarte about the assets and liabilities of the corporation, demanded a general balance sheet, and "in the use of the powers to him granted" appointed Abe-

lardo Pujol Barrera, a captain in the Merchant Marine, to represent him in the intervention with the same powers vested in the interventor.

Respondents have offered nothing to support the statements contained in the Resolution, nor have they shown any source of the claimed "power vested in" the Minister in Charge of the Recovery of Misappropriated Property, except a reference to Law No. 78, proclaimed on February 13, 1959, as the organic law of the Ministry for the Recovery of Misap-

propriated Properties by Manuel Urrutia Lleo, then President of the Republic of Cuba.[5]

The unfriendly attitude of the new government to the United States has increased during the "Year of the Revolution", and the government has repeatedly taken over private property without any kind of court authority. As recently as January 11, 1960, the United States Government protested the seizure and occupation without court order of land and buildings owned by citizens of the United States.[6]

5. No copy of Law No. 78 was offered in evidence or presented to the court. It was agreed, however, that it contained the following provision: "The present law has retroactive effect, due to the nature of the purposes pursued, all of which are of public interest, social benefit and national necessity, and in view of the urgency to reimburse to the National Treasury the proceeds of misappropriations, frauds and other criminal schemes carried on to its prejudice. * * * All acts and resolutions adopted by the Minister of the Recovery of Misappropriated Properties to carry out the same purposes of this law, prior to its date, are hereby ratified."

Since Law No. 78 was proclaimed on February 13, 1959, it does not appear that it provided any authority for the Resolution of the Minister on January 22, 1959, whatever authority it may be for the continuance of the intervention. Later in 1959, "the Year of the Revolution", Dr. Urrutia was removed as President of the Republic for failure to proclaim decrees desired by Castro.

6. Following is the text of a statement issued on January 11, 1960, by the State Department describing its note to Cuba on seizures of property of United States citizens:

"Ambassador Phillip W. Bonsal, who returned to Havana on Sunday, delivered today to the Ministry of Foreign Relations a note prepared in the Department of State during the Ambassador's period of consultation in Washington protesting to the Government of Cuba the numerous actions taken by officials of that Government which are considered by the United States Government to be in denial of the basic rights of ownership of United States citizens in Cuba—rights provided under both Cuban law and generally accepted international law.

"The actions in question involved principally the seizure and occupation of land and buildings of United States citizens without court orders and frequently without any written authorization whatever, the confiscation and removal of equipment, the seizure of cattle, the cutting and removal of timber, the plowing under of pastures, all without the consent of American owners. In many cases no inventories were taken nor were any receipts proffered nor any indication afforded that payment was intended to be made. These acts have been carried out in the name of the National Agrarian Reform Institute.

"(A case was cited in which a Marine dredge and a tugboat under United States registry, valued at approximately $500,000, were seized without any written authorization, inventory or receipt.)

"Several of these cases have been previously brought to the attention of the Government of Cuba by the Embassy of the United States but without result. Nor have the direct protests of the interested parties been fruitful.

"The United States Government, in its notes of June 11 and Oct. 12, 1959, to the Government of Cuba, expressed its full support of soundly conceived programs for rural betterment, including land reform. This support has been demonstrated by United States assistance given such programs in many countries. However, the United States Government at the same time expressed its firm belief that their attainment is not furthered by the failure of the Government of Cuba to recognize the legal rights of United States citizens who have made investments in Cuba in reliance upon the adherence of the Government of Cuba to principles of equity and justice." The New York Times, January 12, 1960.

Discussion

### A.

### Admiralty Jurisdiction

Respondents contend: (1) that admiralty has no jurisdiction over contracts for the sale of a ship; (2) that the lease-purchase agreements are essentially contracts of sale; that the provisions for preliminary leasing are inseparable from the provisions for sale; and, therefore, admiralty has no jurisdiction of any of Libelant's claims.

7. Gilmore and Black, The Law of Admiralty, pp. 24–25; Admiralty Jurisdiction and Ship-Sale Contracts, 6 Stanford Law Review 540.

8. Art. III, sec. 2, of the Constitution extends the judicial power of the United States to "all Cases of admiralty and maritime Jurisdiction". The Judiciary Act of 1789, sec. 9, implemented this grant by providing that the district courts should have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it. See 28 U.S.C.A. § 1333.

At the time the Constitution was adopted, the jurisdiction of the British Court of Admiralty was limited by the "locality test", as a result of its conflict with the common law courts. On the other hand, the jurisdiction of the colonial courts of vice-admiralty had not been so limited, but had been similar to the broad jurisdiction exercised by other maritime courts throughout the shipping world, applying the "subject matter test" of the civil law in deciding what contracts were within the admiralty jurisdiction. For many years the courts of the United States were in hopeless confusion as to what was intended by the relevant provisions of the Constitution and of the Judiciary Act. The prevailing rule became the rule stated by Justice Story in DeLovio v. Boit, C.C.D.Mass., 7 Fed.Cas. page 418, No. 3,776, namely, that the jurisdiction "comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." 7 Fed. Cas. at page 444. This rule was followed in the landmark case of Insurance Co.

### (1)

### Contracts of Sale

Respondents' first proposition—that admiralty has no jurisdiction over contracts for the sale of a ship—is generally accepted in the United States but has been criticized and regarded as anomalous.[7] Neither the Supreme Court nor the Fourth Circuit has passed on the question, and there are few cases in other federal courts directly in point. The historical basis for the claimed rule is confused.[8]

v. Dunham, 1871, 11 Wall. 1, 20 L.Ed. 90, where it was held that whether a contract was "maritime or not maritime depended, not on the place where the contract was made, but on the subject matter of the contract. If that was maritime, the contract was maritime. This may be regarded as the established doctrine of the court." 11 Wall. at page 29.

The English locality test had been repudiated with respect to contracts in a number of earlier cases, e. g. New Jersey Steam Navigation Co. v. Merchants' Bank, 1848, 6 How. 344, 12 L.Ed. 465, and Morewood v. Enequist, 1860, 23 How. 491, 16 L.Ed. 516, which held that charter parties and contracts of affreightment are maritime contracts, cognizable in courts of admiralty by process either in rem or in personam.

Meanwhile, however, the Supreme Court had held, in People's Ferry Co. of Boston v. Beers, 1857, 20 How. 393, 15 L.Ed. 961, that a contract to build a ship is not a maritime contract. The Court gave a number of reasons for its decision, one of which seemed to hark back to the English "locality test". Peoples Ferry Co. of Boston v. Beers was discussed in Morewood v. Enequist and Insurance Co. v. Dunham. In Morewood v. Enequist the Court said that the arguments used in stating the opinion of the Court in People's Ferry Co. of Boston v. Beers "must be referred to the subject before it, and construed in connection with the question to be decided. They have no reference whatever to any former decisions of this Court on the question now (it is hoped for the last time) mooted before us." 23 How. at page 495. In Insurance Co. v. Dunham, the Court said that Peoples Ferry Co. of Boston v. Beers should be "construed in connection with the precise question before the Court; in other words, that the effect of that decision was

The Supreme Court has held that admiralty has no jurisdiction to grant specific performance of an alleged contract of sale of a vessel, saying: "While the court of admiralty exercises its jurisdiction upon equitable principles, it has not the characteristic powers of a court of equity. It cannot entertain a bill or libel for specific performance * * * The jurisdiction embraces all maritime contracts, torts, injuries, or offenses and it depends, in cases of contract, upon the nature of the contract, and is limited to contracts, claims, and services purely maritime, and touching rights and duties appertaining to commerce and navigation." Rea v. The Eclipse, 135 U.S. 599, at page 608, 10 S.Ct. 873, at page 876, 34 L.Ed. 269.

In The Ada, 2 Cir., 250 F. 194, reversing D.C.S.D.N.Y., 239 F. 363, the charter of a vessel gave the charterer an option to purchase for the sum specified in the charter party as the hire. The owner withdrew the vessel, and the charterer filed a libel in rem against the vessel and in personam against the owner to recover damages sustained by the charterer, both for breach of the charter and for breach of the contract of sale. The owner filed exceptions to the libel, on the ground that the damages claimed arose from a breach of contract for the sale of the vessel, which was a cause of

action not within the admiralty jurisdiction. 250 F. at page 195. Judge Smith,[9] for reasons of jurisdiction, in effect severed the two causes of action, and the claim based upon the anticipatory breach was pursued in an action at law. 239 F. at page 372, 250 F. at page 195. The cause of action for breach of the charter provisions came on before Judge Learned Hand, sitting in admiralty. Judge Hand found that the owner had wrongfully withdrawn the vessel, and was liable to the charterer for the loss sustained by it as charterer, although the damages for breach of the sale provisions were not recoverable in admiralty. 239 F. at page 372, 250 F. at page 195. The Court of Appeals reversed, on the ground that the District Court lacked jurisdiction. Each of the appellate judges filed an opinion. Without the citation of any authority whatever, they agreed that a contract for the sale of a ship is not a maritime contract; they seemed to agree, each for different reasons, that the charter provisions and the sale provisions were inseparable, and that the contract should be treated as a contract of sale.

■ The Ada was followed in Rivara v. James Stewart & Co., 119 Misc. 73, 195 N.Y.S. 841, and in Grand Banks Fishery Co. v. Styron (The Caracara), D.C.S.D.Me., 114 F.Supp. 1.[10]

not to be extended by implication to other cases." 11 Wall. at page 28.

In Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 41 S.Ct. 65, 66, 65 L.Ed. 245, the Court followed Peoples Ferry Co. of Boston v. Beers, but said: "Notwithstanding possible and once not inappropriate criticism, the doctrine is now firmly established that contracts to construct entirely new ships are nonmaritime because not nearly enough related to any rights and duties pertaining to commerce and navigation. It is said that in no proper sense can they be regarded as directly and immediately connected with navigation or commerce by water."

In New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 244, 66 L.Ed. 482, a repair case, where it was argued that the same rule should be applied in repair cases as in construction cases, the Court refused to do so, saying: "It is

not always easy to determine what constitutes repairs as opposed to original construction. A contract for the former, is maritime; if for the latter, it is not. We are not disposed to enlarge the compass of the rule approved in Thames Towboat Co. v. The 'Francis McDonald', under which contracts for the construction of entirely new ships are classed as nonmaritime, or to apply it to agreements of uncertain intendment—reasonable doubts concerning the latter should be resolved in favor of the admiralty jurisdiction."

9. Evidently Judge H. A. M. Smith of the Eastern District of South Carolina, an experienced admiralty judge.

10. Since it is agreed that admiralty has jurisdiction of contracts for repair of a vessel, and repairs often give rise to a maritime lien, the decision in The Caracara seems particularly anomalous.

The Guayaquil, D.C.E.D.N.Y., 29 F. Supp. 578, and other cases have followed Rea v. The Eclipse in holding that an admiralty court has no jurisdiction to grant specific performance of a contract to purchase a vessel.

### Should Contracts of Sale Be Considered Maritime Contracts?

█ Although it is firmly established by reason and authority that admiralty has no jurisdiction to grant specific performance of a contract to purchase a vessel, it does not necessarily follow that all contracts of sale are non-maritime. Admiralty courts pass on questions of title in petitory and possessory libels not calling for specific performance.

There are valid arguments in favor of the proposition that admiralty courts should take jurisdiction over claims arising out of contracts for the sale of a ship, though not for specific performance of contracts of sale, and even stronger arguments for taking jurisdiction over claims arising out of lease-purchase contracts. For example, admiralty courts are generally familiar with the subject matter of such contracts and with the related questions which frequently arise; admiralty procedure is usually more flexible and speedier than state court procedure in comparable cases; the admiralty rules with respect to attachment, release on stipulation, and the like, are uniform throughout the country and are well known to admiralty lawyers, whereas the attachment laws and practices of the several states are very different and are ill-adapted to cases involving vessels engaged in navigation, where seamen, cargo owners and others may have all sorts of conflicting claims and liens, which admiralty courts and the admiralty bar are accustomed to handle.

The traditional subject matter test—whether the contract relates to the navigation, business or commerce of the sea—would seem to be met by contracts for the sale of a ship. Even the more restrictive statement of the test—whether the contract concerns transportation by sea, or is one of navigation and commerce within navigable waters—is met by the lease provisions of the typical lease-purchase contract, including the contracts involved in this case.

I conclude that it would be desirable for admiralty courts to take jurisdiction over claims arising out of contracts for the sale of ships, and even more desirable for them to take jurisdiction over claims arising out of lease-purchase contracts. Such contracts seem to be maritime contracts under the tests generally applied by the Supreme Court.

But it is not necessary for me to decide in this case whether a simple contract for the sale of a ship is maritime or not. The contracts in this case are lease-purchase contracts, and for the reasons set out below, I have concluded that the provisions of the lease-purchase contracts under which the claims alleged in the libel arise are separable from the sales provisions of those contracts, and that some, at least, of the alleged claims are maritime claims.

### (2)

### Separability

█ The lease-purchase contracts involved in the instant case provide for the leasing—essentially bareboat chartering—of the vessels for fifteen years under one contract, seven years under the other, with certain options to the lessee and to the owner respectively. The contracts give the lessee two options, which may be exercised at any time: (a) to terminate the lease without further obligations, and (b) to purchase the ships, and to apply on account of the purchase price the payments theretofore made for rental or charter-hire. The owner's options are (a) to convert the contract into a sale with mortgage, and (b) to terminate the contract in the event of a default. If the several contracts had run to nearly their full course, the lessee would undoubtedly have exercised its option to purchase, because the payments for rental or charter-hire would have nearly equalled the purchase price. But many events might have occurred in the early part of the term to cause the lessee to terminate the contract.

The contracts in the instant case are therefore different from the contract in The Ada, which ran for only six months and gave no similar termination option to the lessee. Yet two experienced admiralty judges, Judge Smith and Judge Hand, held in that case that the charter provisions of the lease-purchase contract were within the admiralty jurisdiction, although they were reversed by the Second Circuit, for different reasons stated by the several judges. Moreover, the overlapping feature of The Ada decision is not involved in this case.

Robinson on Admiralty, p. 186, says: "Whether mixed contracts, those partly non-maritime, are dealt with in toto by the admiralty courts is a question on which there is a lack of clarity. There is judicial talk that for admiralty jurisdiction the contract must be 'wholly maritime'. But the cases show that the maritime aspects, if a substantial part of the whole contract, may be litigated in the admiralty courts if they are separable." Gilmore and Black, The Law of Admiralty, pp. 25–26, refers to mixed contracts as one of the "doubtful areas", and discusses the cases on p. 26, n. 95.

In Compagnie Francaise De Navigation a Vapeur v. Bonnasse, 2 Cir., 19 F. 2d 777, 779, certiorari denied American Exchange Irving Trust Company v. Bonnasse, 275 U.S. 551, 48 S.Ct. 114, 72 L.Ed. 421, Judge Learned Hand, this time speaking for the Second Circuit, said: "A contract both maritime and nonmaritime is ordinarily indivisible, so that the rights of the parties cannot be adjusted separately, those maritime in the admiralty, and the rest elsewhere. Admiralty must refuse to assume any jurisdiction over it at all, because it must either ignore the principles of the law of contract, or extend its powers beyond their constitutional scope. But in so far as the maritime obligations may, consistently with those principles, be separately adjudicated, there is no objection to the jurisdiction of the admiralty pro tanto. This is clearly intimated in Turner v. Beacham, Fed.Cas.No.14,252, and The Pennsylvania, 2 Cir., 154 F. 9, though the decisions did not require such a holding. The mere fact that the contract covers a subject-matter of both kinds is not therefore decisive; that would make the mere form control. The substantial question is whether the maritime obligations can be separately enforced without prejudice to the rest."

In the instant case several of the vessels had been delivered to Libelant under the English and Canadian contracts, respectively. Some of the claims asserted in the libel (as particularized in the exhibits attached to Browning's affidavit) with respect to *those* vessels are clearly maritime in character, and are properly asserted *in personam* against Banco in the amended libel. The claims for expenditures incurred in the performance of the lease provisions of the Canadian contract with respect to the Ciudad de la Habana are properly asserted *in rem* against that vessel and *in personam* against Banco.

Other claims are based upon the allegation that Libelant will suffer damages for loss of profits which would have been realized solely from the leased operation of the Ciudad de la Habana and the other vessels, delivered and not delivered. None of those claims can be asserted *in rem*, Gilmore and Black, op. cit., p. 520 et seq.;[11] it is not necessary to decide at this time to what extent those claims can be asserted in this proceeding.

### B.

#### The Intervenor

■ The appointment of an "intervenor" for Libelant under the circumstances set out in the statement of facts, above, does not prevent the proper officers of Libelant from bringing this suit on its behalf in a court of the United States. There was no court proceeding in Cuba. There was no statute or other law justifying the appointment until the proclamation of Law No. 78, which attempts to justify, ex post facto, seizures,

---

11. See also Acker v. The City of Athens, 4 Cir., 177 F.2d 961; Archawski v. Hani- oti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676.

theretofore made by the Minister for the Recovery of Misappropriated Properties.

The Resolution appointing the intervertor did not even attempt to set out any facts justifying the appointment of an interventor for Libelant (Browning de Cuba, S.A.), such as were recited in support of the appointment of an intervertor for the two other shipping companies referred to in the Resolution. Respondents have shown no such facts, and have cited no authority to support their exceptions to the libel on the ground that it was not properly brought, or not properly supported by the affidavit of Libelant's Vice-president.

### C.

*Should This Court Decline Jurisdiction?*

■ "Admiralty courts * * * have complete jurisdiction over suits of a maritime nature between foreigners. Nevertheless, 'the question is one of discretion in every case, and the court will not take cognizance of the case if justice would be as well done by remitting the parties to their home forum'." Langnes v. Green, 282 U.S. 531, 544, 51 S.Ct. 243, 248, 75 L.Ed. 520, quoted in Canada Malting Co. v. Paterson Co., 285 U.S. 413, 420, 52 S.Ct. 413, 76 L.Ed. 837. The question has most frequently been presented in suits by foreign seamen against masters or owners of foreign vessels, relating to claims for wages and like differences, or to claims of personal injury. See e. g. Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254; The Fletero v. Arias, 4 Cir., 206 F.2d 267, 270, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398. The factors which govern the decision are discussed in Canada Malting Co. v. Paterson Co., supra, and in Gulf Oil Co. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055.

■ As is usual in such cases some factors in the instant case look one way, some the other. Both parties are Cuban corporations; Libelant was incorporated in order to obtain the contracts in suit, which deal with ships which were or became part of the Cuban merchant marine. One contract was made in Cuba, the other in Canada. These facts would ordinarily weigh heavily in favor of this court's refusing jurisdiction, even though most of Libelant's stockholders and directors are citizens and residents of the United States. The situation in Cuba today, however, is far from ordinary; it is very doubtful whether Libelant can hope to receive justice in Cuba. That is the dominant factor to be considered in every case when such doubt exists.

■■ In both contracts the parties assented to the jurisdiction of the Havana courts and agreed to waive all other jurisdiction, but that fact is not controlling in this case. The Supreme Court has left open the question of the effect of such an agreement on the jurisdiction of courts of the United States. The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed. 2d 723. The weight of authority, exemplified by Wm. H. Muller & Co., Inc. v. Swedish American Line, 2 Cir., 224 F.2d 806, 56 A.L.R.2d 295, holds that "in each case the enforceability of such an agreement depends upon its reasonableness * * * the parties by agreement cannot oust a court of jurisdiction otherwise obtaining; notwithstanding the agreement, the court has jurisdiction. But if in the proper exercise of its jurisdiction, by a preliminary ruling the court finds that the agreement is not unreasonable in the setting of the particular case, it may properly decline jurisdiction and relegate a litigant to the forum to which he assented." 224 F.2d at page 808. In that case, while refusing jurisdiction in favor of Swedish courts, the Second Circuit noted: "There is no contention that the Swedish courts are not capable of adjudicating this case fairly and justly." In the setting of the case at bar, it would be unreasonable and unjust to relegate Libelant to a Cuban forum.

### Conclusion

Respondents' exceptions are hereby overruled.