**Joseph J. RICCI, et al., Plaintiffs,**

**v.**

**KEY BANCSHARES OF MAINE, INC., et al., Defendants.**

Civ. A. No. 82–0249 P (ME).

United States District Court, D. Maine.

July 11, 1986.

As Amended Aug. 6, 1986.

Richard E. Poulos, John S. Campbell, Portland, Me., James M. Bergenn, Hartford, Conn., Jonathan C. Moore, Brooklyn, N.Y., for plaintiffs.

Allen van Gestel, Goodwin, Procter & Hoar, Boston, Mass., for Bergenn.

John N. Kelly, Kelly, Remmel & Zimmerman, Portland, Me., for Poulos & Campbell.

Jules L. Mogul, Louis H. Kornreich, Bangor, Me., for defendant Depositors Trust.

Richard M. Zielinski, Gael Mahony, John A.D. Gilmore, Hill & Barlow, Boston, Mass., for defendants Haselton & Key Bank of Cen. Me. & Holdsworth.

Thomas D. Burns, Catherine White, Thomas Peisch, Burns & Levinson, Boston, Mass., for defendants Key Bancshares & Key Bank.

David C. King, Paul L. Rudman, Phillip D. Buckley, Bangor, Me., for defendants Depositors & Key Bancshares.

## OPINION

BAILEY ALDRICH, Senior Circuit Judge*.

In 1982 plaintiff Joseph J. Ricci and a number of related corporate plaintiffs brought this action against Key Bancshares of Maine, Inc., and a number of other defendants, in multiple counts for, as plaintiffs describe it, multi-million dollar damages for ceasing to loan them money. Prior to trial the Massachusetts District Court judge who had been assigned to the case became obliged to attend to his own calendar, and in December, 1985, Judge Bruce M. Selya, of the Rhode Island District Court, was designated to replace him. There followed an immediate request on behalf of plaintiffs, by their long-time Maine counsel, Richard E. Poulos and John S. Campbell, for a trial "as soon as possible." On January 15, 1986,[1] plaintiffs' asserted trial counsel, one Daniel Lilley, filed a request to be allowed to withdraw because of "serious and irreversible differences" with plaintiffs "since the outset of representation." This was a discharge, not a voluntary withdrawal.

On February 11, counsel met with Judge Selya, primarily to discuss a trial date. In introducing himself Attorney Poulos stated, "We also have, your Honor, new counsel by the name of Duane Fitzgerald together with Mark Hailey, who will be entering their appearance the next day (sic). Mr. Fitzgerald would have been here today except the case is he has a bad back."

As the first order of business Attorney Lilley's motion to withdraw was allowed, no one speaking thereon, and the court remarking, "Plaintiffs ... seem to be abundantly represented by other counsel." Lengthy discussion was had as to the pros and cons, engagement-wise, and otherwise, of various months for trial, and it was eventually set that mid-May was the primary designated time, subject to the court's engagements, and to certain other cases having terminated. Attorney Poulos stated that twenty days lead time would be sufficient. The date when is not clear, but the suit that had been the primary obstacle to this one's going to trial was thereafter settled, and on April 15, at the court's request, the clerk notified counsel that trial would commence on May 12th. The next day plaintiffs, through Attorneys Poulos and Campbell, moved that the trial date be continued to "a date certain in August or September." Accompanying this motion was a memorandum by Attorney Poulos

---

* By designation.

1. All dates hereafter are 1986.

stating that at the February conference, "plaintiffs believed they would be able to retain the services of Duane Fitzgerald." Not only was this qualification not what he had told the court, but it appeared that although shortly after the conference he had learned that Attorney Fitzgerald had not been retained,[2] he had failed to inform the court. Not until now, although they had searched far beyond New England, did plaintiffs have even a prospective substitute.

Attorney Poulos furnished a lengthy written explanation for this uncorrected misrepresentation, the sum and substance of which is that he felt, to plaintiffs' disadvantage, and to his "embarrassment," that the court "would not look favorably" on a motion for continuance on the ground that plaintiffs were without trial counsel, and he thought that he would be saved either by their obtaining other counsel in time, or by the mid-May date failing to clear. He concluded this explanation with the plea that his clients should not suffer on account of his mistaken "judgment."

Although I[3] am satisfied that this was not the intent, it would be difficult to draft a motion for continuance in a form better calculated to produce a negative effect. Counsel's explanation that he feared he would not fare well was no reason for not having immediately corrected the important misstatement he had left on the record. The court's allowance of Attorney Lilley's withdrawal, and the May assignment, had both been based, and understandably so, upon counsel's positive assertion that Attorney Fitzgerald had been retained. Nor is an uncorrected, serious, misrepresentation to be charged off as an error of judgment that should be overlooked. Concededly, counsel was in a hole—of his own making—but any court in April would at least have expected a sub-

stantial apology beyond an exposition why he had hoped no harm would come of it.

Other than perhaps psychological, this was, however, relatively speaking, unimportant. The motion was on three substantive grounds. The first was that plaintiffs had now engaged New York trial counsel, but one whose "long-standing commitments for May and June ... preclude his appearing ... during those months." (To the court's understandable annoyance, it developed that one of these commitments was a vacation.) The second was that because, since the fall of 1985, plaintiff Ricci was a candidate for Maine Governor in the Democratic primary to be held on June 10, trial in May or June would be highly detrimental. Why this now vital matter had not surfaced in February when a trial date was being selected did not appear, although counsel had obviously known of it. So did Ricci. See n. 10, post. Now it had become "the extraordinary set of circumstances that have led to the potential of the simultaneous occurrence of the trial and the balloting."

Nor did it appear why plaintiffs were now asking that an estimated four weeks trial should start in August or September, a time when, if Ricci won the primary, he would owe it to the Party, as well as to himself, to be seriously electioneering. Might not the judge have seriously wondered whether Ricci had any genuine belief that he could win the primary? The third reason was even less appealing. Mid-May would be a poor time for trial because of the imminent release of a program on CBS's "60 Minutes" that would publicize the case, presumably to defendants' disadvantage. Since Ricci had participated in that program, to defendants' great concern, I must accept defendants' characterization of its being an ironical ground for giving plaintiffs relief.

---

2. On May 6, in connection with a renewed motion for continuance, plaintiff Ricci told the court,

"I had never retained Mr. Fitzgerald even remotely. When I left his office, I made it quite clear that he would not be my counsel."

3. I use the personal pronoun throughout this opinion in order to prevent confusion with Judge Selya.

If counsel had come simply with a hard luck story about trial counsel, the motion might have at least elicited some portion of sympathy as against the not unnatural objections of defendants' counsel, who had been clearing their calendars for trial. With three annoying reasons I do not find it altogether surprising that the court had doubts as to plaintiffs' good faith. In any event, it denied the motion, in part as too late.

On May 2 Attorney James W. Bergenn, of Hartford, Connecticut, moved to enter a limited appearance for the purpose of filing and prosecuting a motion for reconsideration of this denial. The motion for a limited appearance was supported by Attorney Poulos and was allowed on May 6. Attorney Poulos's affidavit stated that he, Poulos, had been "general counsel" for all plaintiffs since the fall of 1983, and that Ricci had discharged Attorney Lilley principally because of "understandable frustration" at his failure to obtain a trial date. In the light of Attorney Lilley's given reason, ante, and with a new judge already assigned, who, presumably, was ready for trial, one could not blame Judge Selya if he disbelieved Attorney Poulos's assertion as singularly unreasonable. I do, myself.

On May 6, in arguing reconsideration because of lack of counsel, Attorney Bergenn repeated that plaintiffs should not suffer because of Attorney Poulos's mistake in not correcting his earlier misstatement. This contention cannot be countenanced. It is true that sometimes parties may be relieved, by what might be called a compassionate theory that, though within his general authority, counsel erred. Here, however, Ricci knew precisely what counsel was doing, or, more exactly, not doing, and urged him to do otherwise. I do not see how Attorney Bergenn can say Ricci "therefore [did not] determine to delay the filing of the motion." On the contrary, his was the last word, and he acquiesced. To overlook now would be to permit calling the toss again after seeing the coin land. Ricci has himself to thank for asking for a speedy trial and, in the next breath, discharging trial (allegedly his only, trial)

counsel before he had another one ready, and then leaving the court to believe that 20 days notice of a trial date would be sufficient.

To the poorly garbed April motion for a continuance there was now added a further, extraordinary wrinkle. Attorney Poulos stated that if a continuance was not granted, he and Attorney Campbell would be required to withdraw as counsel, leaving plaintiffs obliged to proceed pro se. The argument went this way. Rule 3.5 of the Maine Bar Rules calls for mandatory withdrawal, with the court's permission, if required, (which it was, Maine District Court Rule 4(b)), if counsel's "continued employment will result in violation of these Rules." Rule 3.6(a) reads,

He shall not

(1) handle a legal matter which he knows or should know that he is not competent to handle, without first associating himself with a lawyer who is competent to handle it;

(2) handle a legal matter without preparation adequate in the circumstances.

■ I am at a loss to see how it could be thought that the purpose of this rule was other than to protect the client. Even if it be assumed that the competence of Attorneys Poulos and Campbell was low, the clients had been unable to obtain anyone more competent. To the extent that counsel may have been unprepared, they were far better prepared than anyone else. To say that counsel's possible inadequacy is a reason for leaving the client in a worse position, with no counsel at all, is to stand the rule on its head. What is more, the judge was correct in stating that a corporation cannot normally appear "pro se" through its principal officer. *In re Victor Publishers, Inc.,* 545 F.2d 285 (1st Cir. 1976). As Attorney Bergenn recognized in his affidavit of May 22, this would make "the most substantial part of plaintiffs' case possibly subject to dismissal."

Whether, as defendants suggest, this proposal of abandonment was intended as a threat to the judge, requiring him to envi-

sage a trial with Ricci appearing pro se if he did not reconsider, and other plaintiffs defaulted altogether, it was used by Attorney Bergenn as giving weight to that motion.

> 10. Because pre-trial preparation counsel of record would be compelled to withdraw in the absence of qualified trial counsel, see paragraph 7 above, Plaintiffs would be forced to proceed without counsel at all.
>
> 12(c) ... [E]thical requirements compel his counsel to withdraw and the Plaintiffs' group would have to proceed pro se.

This interpretation of the rules is the nadir of ethical responsibility towards a client. Attorney Bergenn states that he did not originate the idea, or endorse it, but neither did he disassociate himself therefrom.

Attorney Bergenn repeated that plaintiffs' newly obtained trial counsel could not try in May, and they had no other counsel qualified to try a jury case. Judge Selya referred to Attorneys Poulos and Campbell, whose withdrawal after they had represented plaintiffs all this time he said he would not permit, and to a Washington lawyer also of record, a member of the American College of Trial Lawyers, as being able to try, and denied the motion for reconsideration, reaffirming the May 12 trial date.

On May 8, Attorney Campbell, mindful that Attorney Bergenn's previously permitted limited appearance did not go that far, filed a motion that he, Bergenn, be permitted to appear for the limited purpose of filing and prosecuting a motion to recuse Judge Selya from all further proceedings. This application was supported by a motion by Attorney Poulos stating, "I have worked with Attorney James W. Bergenn ... in connection with the filing of a motion for recusal and related proceedings to be filed in this action." Filed simultaneously by Attorney Bergenn was plaintiffs' motion for recusal of Judge Selya, accompanied by a ten-page affidavit of plaintiff Ricci sworn to before Attorney Campbell, and Attorney Bergenn's affidavit of good faith as required by 28 U.S.C. § 144, though not, perhaps, by § 455, that was the basis for the motion, "his impartiality might reasonably be questioned." (§ 455(a)).

Basically, this motion was in three parts. Judge Selya lacked the appearance of impartiality, first, because he had been previously active in Republican politics, and because of his previous political association, and present friendship, with Senator Chafee of Rhode Island. Senator Chafee and he shared the "political interests" of Maine Congressman McKernan, who was expected to be the Republican candidate for Governor of Maine in November, and would like to have McKernan win. Second, the Judge and Senator Chafee were actively working to secure the Judge's nomination to the First Circuit Court of Appeals. Third, various actions taken, and remarks made, by the Judge in connection with the motions for continuance themselves "raise questions concerning the Judge's impartiality."

[redacted] At the hearing on this motion on May 9 Attorney Bergenn asked permission for depositions for discovery, which the Judge denied forthwith, as frivolous.[4] On May 12 he denied the motion to recuse and denied a motion to stay, but granted a continuance of the trial. This last he did so that sanctions might be considered. He suggested that the motion for recusal merited possibly severe sanctions pursuant to F.R.Civ.P. 11, but asked that another judge should determine the question. I was designated to the Maine District Court for that purpose, and conducted an evidentiary in-

4. I will not comment further on this request, except to say that a motion to recuse is not a mere pleading, a first step towards a possible case. Like any public official, a judge is presumed to be qualified to act, and an objector must come with a prima facie case, not just a hope of developing one. *Cf. Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (Plaintiff suing public official must show at the start a breach of qualified immunity, and cannot proceed by way of depositions). It should be obvious that any other rule could make a shambles of judicial proceedings.

quiry on May 28.[5] To that culmination this opinion relates.

As already stated, the asserted basis for the motion was that Judge Selya lacked the appearance of impartiality, viz., that "his impartiality might reasonably be questioned," to pass on a motion for continuance because a denial would impair plaintiff Ricci's electioneering for the Democratic primary, the likely Republican in the ultimate election to be Congressman McKernan. Before addressing the merits, I consider the ground rules. "[M]ight reasonably be questioned" is not the clearest language. How forceful is "might"? "Questioned" by whom? As to the latter, counsel say by the man in the street, since the strength of the courts must depend ultimately upon public acceptance. The difficulty is that this proves too much. Unsupported scandal may become so widespread that even a reasonable man in the street may be convinced. The un-workability of this must be manifest. The Court of Appeals has expressed the true rule clearly.

First, a charge of partiality must be supported by a *factual basis* [citations omitted]. Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers. [Citations omitted.] ... Second, disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality. *In re United States*, 666 F.2d 690, 695 (1st Cir.1981) (Emphasis in orig.).

Although plaintiffs speak of the reasonable man in the street, their definition includes a man who knows the full facts even if those facts are not known on the street. This it must, as little of the content of the Ricci affidavit was on the street in the State of Maine. I accept that position, to the extent of what is in the affidavit, but will do so no further. (See n. 4, ante.)

What, then, is the "reasonable, factual basis" supplied by the Ricci affidavit? Congressman McKernan is the probable Republican front runner in the coming Republican primary for governor. This is adequately shown. Ricci is one of five candidates in the coming Democratic primary. Conceded. There is no follow-up. There is no showing that Ricci is a front runner, or even a prominent candidate. His "theme" that he is the only one who can beat McKernan, not in the affidavit, but added orally by counsel at the hearing, is not only not evidentiary, but there is no indication in the affidavit that, even with unrestrained electioneering, there is any likelihood that he will have the opportunity to prove it. For all that affirmatively appears, and the burden was on the movants, Ricci was a candidate of no prospects or importance whatever, or even of believed importance.

Correspondingly, there is no showing that McKernan wants Ricci silenced, or is apprehensive, or that the "man in the street" thinks he has any reason to be. Yet a benefit, or apparent benefit, to McKernan must be the keystone upon which the whole arch, or bridge, Selya to McKernan, depends. The Judge's impartiality cannot be open to question unless there is a basis for believing he might, by his decision, confer a favor on McKernan. So far as appears, Ricci is of no concern, and impeding him no favor.

On this entirely empty affidavit Attorney Bergenn argued to the Judge that "denying the ... continuance clearly favors ... McKernan," and can "take a substantial opponent ... out of the race." His present counsel speaks of Attorney Bergenn's advocacy and zeal. Neither one can permit the making of something out of nothing.

---

5. In point of fact Judge Selya made remarks suggesting, inter alia, that appropriate sanctions might include dismissal of the case. As I stated at the hearing, apart from recognizing his rulings I do not accept any findings or conclusions voiced by Judge Selya, but consider the matter de novo.

Having himself prepared the affidavit, and gone over it with Ricci "word by word" only two days before, Attorney Bergenn must have known what was not in it. Quite evidently he knew what needed to be in it. The inference seems plain: Ricci could not take oath to being a candidate of substance, so counsel supplied it; a distinction I cannot overemphasize.[6]

Although I consider this a fatal deficiency, and believe that Attorney Bergenn must have been aware of it, I must continue on because no one, at anytime during oral argument, or in defendants' brief, ever noted it.[7] The point made was the weakness of any connection between the Judge and the Congressman.

First, the claim of a direct relationship. The sole allegation is that, "upon information and belief [McKernan] is known by and has had mutual political interests with Judge Selya between the years 1978 and 1982" (viz., when McKernan was in Congress and Judge Selya not yet a judge). The Judge then had a high managerial office in the Rhode Island Republican Party and was active, including seeking to defeat Democrats. Orally, however, Attorney Bergenn conceded that Ricci had no information that the Judge and the Congressman even knew each other. Thus "known by" was not on information and belief, but pure speculation. As to the Judge's active past general political activity, nothing is clearer from the opinion in *Home Placement Services, Inc. v. Providence Journal Co.*, 739 F.2d 671, 675 (1st Cir.1984), *cert. denied* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969, the case on which plaintiffs particularly rely for other purposes, than that such past cannot carry

over and disqualify, absent special circumstances. The mere fact that the Judge and Congressman had shared "mutual political interests," whatever that loose term may mean, is not such.

Perhaps so recognizing, the affidavit asserts that Judge Selya had been politically close, and was personally close, as shown by the recent *Home Placement* opinion, to Republican Senator Chafee of Rhode Island and that the Senator and Congressman McKernan have "endorsed and/or supported" each other's "political interests." Again, no factual basis is alleged, and the term "political interests" is unspecific. The only definition to be found is in the May 22 affidavit of Attorney Bergenn (the drafter of the Ricci language), "approximately the same range of the conservative liberal spectrum." The Senator and the Congressman not only are not in the same legislative branch, they do not even come from the same state. Apart from a shared political philosophy, and the presumable pleasure in seeing any fellow Republican, even on the state side, succeed, the affidavit asserts nothing beyond speculation that Senator Chafee was close enough to McKernan to be in any way concerned with his bid for the governorship. Even if, because of their personal friendship, the Judge is to be charged with the Senator's interests, it is a large step to consider this to be partiality in the Section 455 sense. This, to escape *Home Placement*'s intendment, should require something more than mere generalizations of "shared," "endorsed," or "supported" "political interests."

Nothing was added by the assertion that Senator Chafee was supporting the Judge

---

6. It is perhaps worth recalling, at least in a footnote, if one is hypothesizing favors to Congressman McKernan, that Ricci had requested that the trial now start in August or September, saying that he would stick to that. What would seem a more likely favor to McKernan, restricting the electioneering of one of five candidates in the Democratic primary, or restricting the electioneering of his opponent in the general election? Judge Selya described this as "incongruous." One might be less polite.

7. The Judge came the closest. In denying recusal on May 12 he condemned Ricci's "hollow ... plea" of electioneering because his now September choice indicated that he either "viewed himself as a non-serious candidate who would assuredly not survive the primary, or else he felt confident of his abilities to mesh his candidacy and the case." Even this did not take the next step, and note the duty on plaintiffs' part to make an affirmative showing that he had a viable candidacy that was capable of being injured.

on the pending possibility that he be nominated by the President for the Court of Appeals. This is cumulative evidence of the friendship between the Judge and the Senator, but what else? At the hearing before me, Attorney Bergenn agreed he had no support beyond a "reasonable inference" for the allegation that the Judge was "working with" the Senator to advance his nomination. If favoring the Congressman would please the Senator, surely that was not necessary in order to keep his already enthusiastic support for the judgeship. We are back at point 1. Or is the Judge to be thought to be secretly scheming with the President to affect a Democratic state office primary? [8]

I turn briefly to the affidavit's allegations that an appearance of partiality was shown by the judge's actions at the hearings. According to the affidavit, the judge's assertion that attorneys already of record could try the case was evidence of lack of impartiality. The judge's conclusion may have been debatable, but I have already recited reasons why his decision was fully understandable quite apart from any desire to assist Congressman McKernan even if it could be thought that there could be that effect. Although Attorney Bergenn was initially told the decision was "inexplicable," a fair reading of the February 11 and April 22 transcripts should have corrected that impression. His counsel suggests now that he came in late, unacquainted with the history, but this is to grasp a sword by the blade; one should not take serious steps when uninformed. And, in fact, among the first questions I asked of Attorney Bergenn was what he had read, and he listed not only these transcripts and the motions, but the "motion in

December for a trial date because I thought that was important to Judge Selya." Demonstrably it had been.

The same goes for the shortness of lead time; Attorney Poulos had already stated twenty days. Nor is any special inference to be attached to the court's consideration of defense counsel, as distinguished from "the *parties* plaintiff." The whole assignment of a trial date from the beginning had been based upon consideration of the calendars of very busy lawyers. This is a fact of life.

■ Finally,[9] I conclude with this extraordinary paragraph in the affidavit:

> (m) ... the federal court's unnecessary and virtually arbitrary requirement that this trial be conducted ... through the critical campaign period up to and including the actual [primary] election ... is unnecessary federal interference with the State election process.

This brings us back to February. Ricci may assent to, indeed, want,[10] a May-June trial, but when the court seeks to hold him to that agreement, suddenly it is told it is guilty of federal-state interference. I quote counsel's sententious language. "[T]he constitutional principles of the Separation of Powers would seem to make compelling any court order which would very easily prevent the one month overlap of the trial and the balloting." This from counsel for a client who had agreed to the date in the first place without reservation or notice.

In short, I find the motion for recusal was not only properly deniable, it was entirely specious.

---

**8.** This is not to say that the matter was not extensively argued before Judge Selya orally, heavy emphasis being placed upon a claim that the hoped-for nomination's having been pending a long time suggested there was something awry. The assertion before me that the judge was not "harassed" could not be more inaccurate. In fact the changes rung on that subject reminded me of the attempt to goad another district judge in *In re Union Leader Corp.*, 292 F.2d 381 (1st Cir.1961). I have been unable to think here of a valid reason.

**9.** There are other asserted matters, such as the judge's unwillingness to let Ricci, when represented by counsel, address him personally, that I will not take space to discuss.

**10.** In Attorney Poulos's May 27 affidavit he stated, "Mr. Ricci determined [on February 17] that he would not retain Mr. Fitzgerald since he wished this case to be tried in mid-May."

Nor can I leave this matter without noting its untimeliness. As early as April 30 recusal was seriously discussed. Attorney Bergenn was told that some New York counsel "would be sought for that purpose." The following day he came across *Home Placement* in another connection, and stated to his associate, according to the latter's affidavit, that the case "might ... be relevant later." How relevant is shown by the fact that on May 6, immediately upon the denial of reconsideration, a discussion of recusal occurred and Attorney Bergenn brought up *Home Placement* "because that was, you know, really one of the most important aspects of it." For six days, *Home Placement* is put aside, and lay dormant; between May 6 and May 8 it becomes the fountainhead. In two days Attorney Bergenn has prepared and filed the presaged motion. While there were a host of players, the project is clear. Try to persuade the judge, but if he is not persuaded, compile, instanter, why he should not have been sitting.

 Correlative with the principle that such motions must be filed at the earliest opportunity, which Attorney Bergenn himself voiced on May 9, is the even more important principle, which he disregarded, that one cannot first try the merits, and, if unsuccessful, fall back upon recusal. In *In re United Shoe Machinery Corp.*, 276 F.2d 77, 79 (1st Cir.1960) the court said, "A party knowing of the ground for requesting disqualification cannot be permitted to wait and decide whether he likes the subsequent treatment that he receives." *See Pacheco v. People of Puerto Rico*, 300 F.2d 759, 760 (1st Cir.1962); *In re Union Leader*, ante 292 F.2d at 390; *Peckham v. Ronrico Corp.*, 288 F.2d 841, 843 (1st Cir.1961); *see also Crowder v. Conlan*, 740 F.2d 447, 454 (6th Cir.1984); *American Public Gas Ass'n v. Federal Power Commission*, 567 F.2d 1016, 1069 (D.C. Cir.1977); *Davis v. Cities Service Oil Co.*, 420 F.2d 1278, 1282 (10th Cir.1970). A judge cannot be acceptable if he finds in your favor, but unqualified when he finds against you. This is classic heads-I-win, tails-you-lose. It was not improper to file a motion for reconsid-

eration, but it was totally improper procedure to present it while consciously reserving recusal as an ace in the hole, or, as Ricci described it before me, his "only other option." This procedure, alone, must condemn the motion from the start.

In sum, the motion was both too late and too little.

Of course, just because a lawyer makes a mistake, he does not become subject to Rule 11. But "advocacy and zeal," or sympathy for a client believed caught in a "desperate" situation is not a substitute for the Rule's requirement of "knowledge, information and belief formed after reasonable inquiry [that the motion is] well grounded in fact and [is] warranted by existing law ... [and] not interposed for any improper purpose, such as to harass or to cause unnecessary delay...." This must mean, within reasonable limits, objective reasonableness. *See Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253–54 (2nd Cir.1985); *cf. Harlow v. Fitzgerald*, ante. I can agree with Attorney Bergenn that he and his associate were exceedingly industrious between May 6 and May 8, but the question must be more than the amount of time spent. When they examined "350–400" newspaper articles and came up with nothing more than they did, it should have demonstrated, beyond rational argument, the emptiness of the claim. This in addition to the absence of any evidence that hampering Ricci's electioneering would be a favor to McKernan. "50–60 cases," plus "Shepardizing the articles and cases," should surely have revealed, if common sense had not, the impropriety of using recusal as a second string to their bow. Mr. Mahony's associate discovered *In re United Shoe Machinery Corp.* overnight. As to delay, it is only too apparent that this was the purpose. Do the best you can, but do it. It may be noted that counsel openly proposed mandamus if the motion failed. (Mandamus was denied July 25, 1986.)

If I may build on Shakespeare, (Hamlet, IV, iii, 9) in court desperate diseases are

not to be relieved by desperate appliances. Sanctions are clearly in order.

■ I do have a problem with regard to Attorneys Poulos and Campbell. I feel that Attorney Bergenn was more than generous in absolving them of responsibility.[11] Nor can one feel kindly towards "general counsel" for the case who was responsible for the originating trouble, and whose proposed abandonment of his clients as a matter of "ethics" I find incomprehensible. However, there is merit in their counsel's argument that all counsel should not be automatically responsible. In a sense, that is why the Rule speaks in terms of "signing." I would go beyond that if the signer was a mere agent, acting under directions. *See* Schwarzer, *Sanctions Under the New Federal Rule 11*, 104 F.R.D. 181, 185–186 (1984). But here Attorney Bergenn was a competent attorney who was retained specially for the task. I do not feel Attorneys Poulos and Campbell should be charged.

As to amounts, I agree in principle with defendants' claim that sanctions in this case should be measured by expenses, including attorneys' fees, resulting from the improper motion, viz., opposing it and arguing what the sanctions should be, and disbursements. Defendants also were put to preparing for a trial which was postponed only at the last minute, and this on account of sanctions. But, correspondingly, the Rule says reasonable expenses. I have reviewed the statements submitted, and they are grossly excessive.

To start with my personal observations, the purpose of the May 28–29 proceedings was to consider motions, with evidence from the possibly chargeable parties. The issues were not broad; recusal had already been denied, and all that remained was application of Rule 11; whether, who, and how much. For this hearing appeared Attorney Burns with, I take it from their hourly rates, two partners and an associate; Attorney Mahony, lead counsel for a co-defendant that had, here, no conflicting interest, with a partner, I take it, and an associate. This made seven Boston lawyers.[12] Of these, only Mr. Burns and Mr. Mahony participated. Even had I permitted more questioning of plaintiffs' side (after conferring with counsel, I ruled I would do this alone, with prompting), I do not envisage there would have been further participants. All seven of these lawyers, incidentally, had expenses, but, subsequent to the original opinion, defendants waived all such expenses. Maximum undertaking: no witnesses of their own; cross-examination of four witnesses; argument, if reached.

If there could be any doubt about the requirements for May 28, there could be none about May 29. The evidence had concluded; Mr. Burns, only, was to argue for defendants. Nevertheless, four other Boston lawyers remained and are charged for. The total Boston fees for these two days come to $8,525 for Mr. Burns's office; $7,235 for Mr. Mahony's. (Part of the latter was for discovery argument.) This not counting travel time the day before.

Mr. Burns and Mr. Mahony are highly reputable and accomplished lawyers. This justifies substantial hourly charges. In complicated procedures they must have complicated assistance. This was not one. Neither needed purely reassuring presences. If consorts were there as a reward for past services, or for educational purposes, this was office expense, of no benefit to the case.

■ Counsel appear to have forgotten altogether the court's admonition in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977), where, at p. 1027, it quoted with obvious approval from the leading case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, at 717 (5th Cir.1974), "The time of two or three lawyers in a courtroom, or

---

**11.** I do not accept Poulos's claim that the statement in his motion for Attorney Bergenn's appearance to file the recusal motion, that he, Poulos, had worked on the motion, was a secretarial error.

**12.** In the statement of charges, two additional lawyers are included, which I will come to. See n. 13, post.

conference, when one would do, may obviously be discounted." Here there was no discount, or even participation. It is difficult not to be offended that a court should be asked to approve charges for five lawyers who made, and who were expected to make, no contribution whatever. Lawyering is not a spectator sport, and if this is to be the practice of the bar, already under public criticism for high charges, I want no part of it. If informed clients wish to pay for such duplication, if this may be so dignified, that cannot be my concern, but to assess it as a reasonable charge against a third party most certainly is. I can best express my feelings at this superlative example by recognizing nothing for these two days, except for a discovery matter, handled separately on May 28.[13]

At the same time, plaintiffs should not receive a total windfall. Naturally, there had been preparation for the court presentation, including a brief. Here Mr. Burns's office charges were $29,907; Mr. Mahony's, $12,165. For appraising these figures, I not only saw the results, but, except for researching law and writing the brief, I had gone through the preparation procedure myself. Anticipating that since sanctions are, strictly, a court and not a party matter, so that I might be conducting, as well as responsible for, the entire hearing, I prepared myself on that basis. This involved studying the February 11 transcript, 22 pages; the April 22 transcript, 60 pages; the April 28 transcript, 18 pages (discovery); the May 6 transcript, 82 pages; May 9, 73 pages; and May 12, 22 pages; 277 in all. Also some motions; defendants'

brief opposing recusal, 6 pages; the Ricci affidavit, 10 pages, and many newspaper clippings. After reading *In re United Shoe Machinery* and *Home Placement,* ante, I prepared detailed questions for each of the four likely witnesses. Ultimately I read briefs and memoranda submitted by the parties.

I do not keep a diary, but I cannot believe this consumed more than three full days. Not to be immodest, but I came in cold; counsel were already familiar with much, and I must wonder that they could need as much time, or that any great strategy was involved, requiring many heads. Counsels' other activity was the mechanics of researching law, and writing the brief. The latter began with a 40–page, essentially narrative account of some of the matters I have previously mentioned. I am forcefully reminded of the court's admonition in *Pilkington v. Bevilacqua,* 632 F.2d 922 (1st Cir.1980) at 925, against "exceed[ing] the bounds of reasonable effort." This narrative was well written, and could well have taken much time. It is hard to believe, however, that any judge, faced with a case of this importance, would not have read the originals of everything so elaborately summarized, even if he assigned himself far less than my putative three days for that and many other considerations. This was a single issue. An appellate brief or an entire case cannot, without permission, exceed fifty pages. F.R.A.P. 28(g). I do not think it fair to charge plaintiffs with much of this extensive undertaking.

---

**13.** In reply to my post-hearing inquiry of the two non-Boston lawyers of their charges, and evidently in response to plaintiffs' vigorous assertion that defendants' fee requests were so excessive that the court should award none at all, they stated that their firm was general counsel for defendants, and that the submission had not been a "Request for Award of Attorneys' Fees," but was merely "complying with the court's request [for] a statement of the costs incurred ... [and defendants] should not be penalized or criticized for complying." Such disclaimer might have read well had it been in the original submission. However, this read,

"1. The Court Should Award Defendants *All* of Their Attorney's Fees Incurred as a Result of Plaintiffs' Misconduct." (Emphasis in original.)
This had included general counsel's charges, now said to be for "monitoring the proceedings and reporting to the Banks;" viz., these two lawyers were thus engaged on May 28, with one remaining on the 29th. However important it may well be for defendants to have such services, I do not consider this a fair additional charge to plaintiffs. This would have meant nine lawyers on May 28; six on the 29th. Nor will I take this late disclaimer across the board. I do apply it to them.

The next part of the brief, the first appearance of any law, was devoted to the proposition that I must give presumptive weight to Judge Selya's factual findings as to plaintiffs' motives. This was not merely a waste of time, but was objectionably improper. This was not, as defendants would have it, a routine case of one judge following another, in the sense of taking up where he had left off, but just the opposite. Judge Selya had requested another judge for "the question of sanctions ... for a judge coming to this matter fresh *to review the record independently.*" (Emphasis suppl.). Manifestly this meant neither an ordinary turnover, nor a turnkey operation. If counsel choose not to read the record, at least they should not be paid.

The only other, hopefully productive, matter that counsel engaged in that I did not was to pursue Judge Selya's thought, reached without review of the authorities, that outright dismissal might be a proper sanction. No doubt they searched the books. The result: nothing even suggesting that dismissal could be a proper sanction for a single motion that could be denied out of hand, with injurious consequences to no one except the time required to oppose it. Sanctions is a straightforward matter; research should not have taken too long.

When one looks at the entire picture, the motion to recuse was filed one day, and heard the next. Yet to prepare simply for a presentation of what sanctions should be imposed, seven lawyers ran up charges of $42,000. Not only might this be seen as presumptive duplication and an excessive investment, but it would be only natural to view it against the approach demonstrated on May 28–29, the brief's disregard of the ground rules, and, also, the occurrence on May 9, post. A minor indication, also, might be found in counsels' charging paralegal time, 6 hours, $240, plus unidentified travel expense, for purely messenger service on May 23, taking a motion to Portland to file. I can have small sympathy for Ricci, but what goes?

To go back to the beginning, on May 8 defendants received the motion to recuse, and on May 9 Mr. Burns and two partners, and an associate of Mr. Mahony's, proceeded to Judge Selya's court in Providence to oppose it. Most of the argument was made by Mr. Mahony's associate. Mr. Burns's argument occupies seven pages of transcript. His partners said nothing. Yet in addition to what I find proper charges for May 8, Mr. Burns, for May 9, charges not only for himself (properly, but not at a discount rate) but $1,120 for each of his partners. With all respect, I can only regard these as a retinue; it is only too apparent that they contributed nothing. Yet three, eight hour, partner days, at full rates, so that one may speak for ten minutes.

■ Even though he said little, it was naturally appropriate for Mr. Burns to go to Providence. In view of what was involved I do not question his charge, but I can think of no excuse for charging for his partners.

Preparation for trial is a different matter. This is a very substantial case. While one might be tempted to wonder, since defendants were anticipating, if the case went to trial at all, many days to be first taken by plaintiffs, here I have no knowledge at all of what was done. I will not question Boston counsel in this area, but allow the total sum, $22,000. This wasted effort was a natural consequence of the motion to recuse.

■ I have not forgotten defendants' claim that plaintiffs should be additionally sanctioned for having improperly obtained the continuance they wanted. In one respect Judge Selya did sanction them by ruling that interest on any recovery shall cease on May 12, 1986. I confirm that ruling, except to say that it will last for only six months. I do recognize that sanctions are not limited to fees and out-of-pocket costs; Rule 11, in terms, is not restricted. *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193 (11th Cir. 1985). However, Judge Selya need not have continued the trial. Defendants in no

way protested; and they are being compensated for their wasted costs. They cannot have it both ways.

 What, then, should be the total charges for fees? I have recognized $33,226 for May 8–12, opposing the motion, and preparation for trial. For May 13–27, preparation and brief for the sanction hearing, discounting heavily the brief except for searching for sanction cases, and having in mind counsels' already paid-for familiarity with the motion and attendant circumstances, I find $16,764, although admittedly an arbitrary figure, a reasonable charge. Even it would have been excessive were it not for the announced possibility of a dismissal. I set $50,000 as a proper sanction.

As to who is to be charged, Ricci was the long-time instigator of the motion. He was not concerned with the judge with regard to the case as a whole; his only concern was to obtain a continuance, however that should be accomplished. If his retained counsel thereby engaged in sanctionable conduct, plaintiffs should not escape the rational consequences. *See Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962); *see also Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir.1978). As to Attorney Bergenn the charge need not be the same. *Cf. Commonwealth Electric Co. v. Woods Hole, etc. Steamship Authority*, 754 F.2d 46, 49 (1st Cir.1985). He was grossly negligent, if not consciously overreaching, and acted, I regret to say, with overweening advocacy, without regard to adequacy, or other considerations. At a minimum the motion was procedurally improper—untimely—and was frivolous in fact. It was used as a device to seek the continuance the court had denied, and, beyond a most charitable view, unreasonable within the meaning of Rule 11. The 1983 amendment both added the phrase "shall impose ... an appropriate sanction" and eliminated the requirement of wilfulness. At the same time, the action was more misguided than truly mischievous, i.e., with wilfully false allegations, and that should still make a difference. *Anschutz Petroleum Market-*

*ing Corp. v. E.W. Saybott & Co.*, (S.D.N.Y. April 24, 1986) [Available on WESTLAW, DCTU database]. I believe a reprimand is sanction enough, but this I order.

An order will be entered that plaintiffs pay into court, for the benefit of defendants, the sum of fifty thousand dollars ($50,000) within twenty (20) days, or furnish a bond with surety, to pay same, plus interest at 6.3%, unless this order is duly reversed. Fifty thousand dollars, though nothing like what defendants ask for, may seem a substantial sum for a single motion, immediately deniable. It is to be recalled that this was a section 455 motion, not attacking the judge personally. However, it was a substantial motion, plaintiffs are in a big league, and are playing hardball. They were fortunate, as partially offsetting the $50,000, to have obtained a continuance, but this, as I have said, was with defendants' at least tacit approval.

