**COMMONWEALTH ELECTRIC COMPANY, Plaintiff, Appellee,**

v.

**WOODS HOLE, Martha's Vineyard and Nantucket Steamship Authority, Defendant, Appellant.**

**No. 84–1591.**

United States Court of Appeals, First Circuit.

Argued Jan. 10, 1985.

Decided Feb. 8, 1985.

Rehearing Denied March 5, 1985.

Frank H. Handy, Jr., with whom Kneeland, Kydd & Handy, Boston, Mass., was on brief, for defendant, appellant.

Timothy R. McHugh, Boston, Mass., with whom Jerome V. Flanagan and Hoch & Flanagan, P.C., Boston, Mass., were on brief, for plaintiff, appellee.

Before BREYER, ALDRICH and TORRUELLA, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

On April 5, 1980 the Nantucket ferry, the 213 foot steamship NAUSHON, owned and operated by defendant Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, departed Nantucket at 7:00 a.m., bound west for Woods Hole. In Vineyard Sound she developed boiler feed-pump problems, and lost some, and eventually all power. At 10:35 a.m. her master, E.B. Jackson, ordered the starboard anchor dropped. The tide was flooding eastward in excess of two knots, and there is a strong indication that the anchor did not set, but dragged a considerable distance before the bow swung into the current and the vessel came to rest.[1] At this point Captain Jackson took cross bearings and determined that he was about 600 feet west of a marked cable crossing. Repairs were instituted, and shortly after 1:00 p.m. the pump was again functioning and Captain Jackson gave orders to weigh anchor. The log shows slow ahead at 1:18, indicating starting to heave. At 1:19 all electric power supplied by these cables to Martha's Vineyard went off.

Closely parallel cables belonging to plaintiff, lying on the bottom and running north and south, were subsequently found to be broken, and for this and the consequential damages plaintiff brought this suit, attributing the breaks to the NAUSHON's anchor. The case was tried in admiralty to the court, which found for the plaintiff and awarded damages in the amount of $552,-125. plus interest. Defendant's appeal relates to liability only.[2] We affirm.

■ Defendant's primary attack is that the court's finding that the NAUSHON dragged from its original halted position and fouled the cables was clearly erroneous. In this defendant would close its eyes to the following uncontradicted facts. The anchor was of the stockless Navy type. When raised that day a rock was found to be jammed between the flukes. If, in this condition, the anchor lay on the bottom with the flukes jammed and pointing upwards, the tilting horn would have protruded ineffectively downwards, with the anchor operating simply as a dead weight. If the anchor was then dragged, it would dig a trench the width of the horn. A more superficial disturbance, the width of the flukes, assuming that the bottom was sand, gravel, or otherwise disturbable, would also be effected.

When, two days later, one Fuglister, an employed diver, descended from a small boat that had been located at the spot indicated by Captain Jackson's initially recorded bearings, he found himself at a trench extending east and west, the shape and measurements of which precisely corresponded with measurements he subsequently took of the anchor. Even defendant's expert, n. 1, ante, who voiced some other possible explanations for the trench, conceded that defendant's anchor could have been its cause. When one adds to this the fact that Fuglister's initial descent from Captain Jackson's plotted position spotted him almost exactly at the trench, it would seem preposterous to think otherwise. In any event, it is preposterous to contend that the court's so finding was clearly erroneous.

Fuglister followed the trench eastward about 700 feet and came upon plaintiff's cables. The cables were not broken at this point, but showed signs, in his opinion, of recent disturbance, confirmed by photographs which he took; the final coincidence. More exactly, it was the penultimate coincidence. Chronologically, the final coincidence was the interruption of all electric current supplied by the cables to

---

1. The "anchor trench" hereinafter referred to began much further west than where the anchor must have been located when the vessel stopped. When the anchor was let go, the vessel was drifting sidewise to the current, exerting more drag than even the "worst case" assumed by defendant's expert, who made calculations, contradicted by plaintiff's expert, establishing that the anchor could not drag.

2. There is a grumble about damage in defendant's brief, but it is not pursued, and, as we read the record, rightly not.

Martha's Vineyard within a minute of starting the anchor.

There is no suggestion of any other active cause. This area, being the middle of Vineyard Sound, was not a normal place for anchoring; indeed, a quite improper one, barring an emergency. No other vessels were seen in the vicinity that morning, except the tub TAURUS, an 85–foot Coast Guard cutter, and a Coast Guard 41–footer. None of these anchored. The cutter, properly enough, volunteered to stand by for a time, although not requested to do so. The court cannot help observing that she contributed to the strain on the NAUSHON's anchor by tying to her stern for half an hour in order to save running her engines.

In the face of this array of physical evidence defendant would have it that the court was clearly erroneous in finding that the NAUSHON dragged down onto the cables because Captain Jackson testified that he constantly checked his cross bearings every ten or fifteen minutes, and they never changed. Defendant says, "[I]t is significant that those bearings did not change during the entire period the NAUSHON was at anchor," but obviously the significance fails if the predicate is not accepted. There was no obligation to accept this testimony, the more particularly where no sightings had been recorded in the log, which the Captain conceded he should have done, but claimed that he had other things on his mind. Since he rarely left the bridge, and the vessel was in no distress, it is not apparent what was so engrossing. His self interest, both as the responsible employee, and as a licensed master, was only too obvious.[3] Rather than clearly erroneous to reject this testimony, in light of the physical evidence we might think it would have been clearly erroneous to have accepted it.

We equally reject defendant's contention that the court's finding,

"defies logic especially in view of Fuglister's testimony that the so-called anchor path passed UNDER (emphasis supplied) four cables without causing damage to the cables at the point of intersection and then continued past the cables for another 50–250 feet. (App. p. 255) No explanation was offered as to how the 3450–pound anchor with its attached 360 feet of chain weighing approximately 7000 pounds in the water could pass beneath four cables without damaging any of them." Defendant's brief, p. 12.

Fuglister did not testify that the anchor passed under the cables. App. p. 255 shows nothing. App. pp. 253–4 show that defendant sought to obtain such testimony from Fuglister, and he resolutely said the opposite. We are shocked by this claim.

What is meant as no "damage" is a matter of semantics. That the actual breaks resulted from strain there exerted, and occurred at a distance, was adequately causally explained by plaintiff's expert. Clear photographic evidence indicated the cables were turned over, and twisted, at the area of the trench. The court's acceptance of this evidence is not refuted by saying there was no "damage." Indeed, one may wonder whether defendant would have advised Robinson Crusoe to disregard the footprint on the beach.

Defendant next claims that, even if it did drag, the court was clearly erroneous in finding it negligent for failing to discover it. On Jackson's own testimony, the anchor was only 900 feet from a known cable area towards which the wind was blowing, and a heavy current was setting. On ordinary negligence principles this imposed a heavy burden of watchfulness. In addition, this called for application of the government safety regulations respecting anchoring. 33 C.F.R. § 164.19 provides,

The master or person in charge of each vessel that is anchored shall insure that;

(a) A proper anchor watch is maintained;

(b) Procedures are followed to detect a dragging anchor; ....

Defendant seeks to say that Jackson was the anchor watch. A man in the pilot

---

**3.** Nor is it conclusive that another witness, a crewman, "stood by the ship" in the courtroom.

house is not an anchor watch, and Jackson knew that none was forward.

"A. Just for the first 15 minutes the mate stood by to make sure that it wasn't dragging.

Usually tell if an anchor is dragging. The chain will jump. Vibration. And after that time, no, sir.

Q. So for the first 15 minutes or so you did, and then after that, you had no reports at all from either one of them, is that correct?

A. No sir. It was entirely up to me. I was watching the situation from the pilot house."

Captain Houtsma, plaintiff's expert, also testified that a dragging anchor would cause the chain to vibrate, and added that another check would be to lower the lead, leaving the line slack, which would take up if the vessel dropped back.[4] The court found that the failure to take these precautions resulted in a violation of the regulation—a conclusion defendant would reject because the Coast Guard had not charged him. No response to this is called for.

 This appeal is totally frivolous. Outside-chance opportunity for a megabucks prize must cost to play. Furthermore, appellant's brief added a significant burden on appellee's counsel and the court. The judgment of the district court is affirmed, with counsel fees to appellee, $10,000 charged against appellant, and an additional $5,000 against appellant's counsel personally.[5]

---

4. Defendant claims on this appeal that it was erroneous to accept Captain Houtsma as an expert as his experience was limited to the Coast Guard. Even an amateur yachtsman, however, should be aware of these elementary checks. Passing the district court's wide discretion, this criticism is peculiarly ill-taken as Captain Jackson himself testified to the chain-test procedure.

A neophyte could think of checking with the lead.

5. *Muigai v. United States I.N.S.,* 682 F.2d 334, 337 (2d Cir.1982); *McConnell v. Critchlow,* 661 F.2d 116, 118 (9th Cir.1981); F.R.App.P. 38; 28 U.S.C. § 1912. This is not a finding as to the fee to which, as between counsel and client, counsel may be entitled.