**NATASHA, INC., Plaintiff, Appellee,**

v.

**EVITA MARINE CHARTERS, INC.,
Defendant, Appellant.**

No. 84–1881.

United States Court of Appeals,
First Circuit.

Argued March 5, 1985.

Decided May 30, 1985.

Gordon P. Cleary, Providence, R.I., with whom Kevin M. Brill and Vetter & White, Providence, R.I., were on brief, for defendant, appellant.

Constance Walker, Houston, Tex., with whom Edward J. Murphy and Clann & Pearson, Houston, Tex., were on brief, for plaintiff, appellee.

Before BREYER and TORRUELLA, Circuit Judges, and RE,* Judge.

BREYER, Circuit Judge.

■ This appeal raises one easy legal question. Does an admiralty court, which normally has jurisdiction over contracts to *charter* a boat, not have jurisdiction when the charter contract forms part of a larger contract to *sell* the boat? The well established answer to this question is that admiralty does have jurisdiction if the charter portion of the sale contract is readily 'separable' from the rest of the contract. *See Eastern Massachusetts Street Railway Co. v. Transmarine Corp.*, 42 F.2d 58, 63–64 (1st Cir.), *cert. denied*, 282 U.S. 883, 51 S.Ct. 86, 75 L.Ed. 779 (1930); G. Gilmore & C. Black, *The Law of Admiralty* § 1–10, at 28–29 & n. 95 (2d ed. 1975). The charter portion of the sale contract before us is readily separable. Hence, admiralty jurisdiction is proper. In fact, the record shows this with sufficient clarity that we find this an appropriate case in which to assess the losing party both double costs and attorneys' fees.

* Chief Judge, of the United States Court of International Trade, sitting by designation.

## I

The record before us suggests that this is a case in which a defendant simply made a contractual promise, broke it, and then unsuccessfully resisted plaintiff's suit to collect damages. The district court found the following facts, all of which have more than adequate evidentiary support in the record.

1. In 1982 Natasha, Inc., the appellee, sold its yacht (called the EVITA) to Evita Marine Charters, Inc. ("EMC"), the appellant. After negotiations, Natasha lowered its price from $1.5 million to $1.4 million plus a promise by EMC that Natasha could use the boat for four weeks after EMC took delivery. Natasha believed that its post-sale charter of the boat would be worth $20,000 to $25,000 per week.

2. EMC accepted Natasha's offer. The purchase and sale agreement specified that Natasha could use the boat for one month (*see* Appendix A). The parties' understanding (in the district court's words)

> was that those four weeks were to be reserved for Natasha's benefit however Natasha felt that it could benefit from the operation of the boat, and Natasha had a right to do a variety of things ... [including the right] to charter the boat for money and to keep the proceeds over and above the running expenses for its benefit.

3. Natasha and EMC closed the sale on October 15, 1982. EMC paid the money due; Natasha transferred ownership; and EMC provided Natasha with a letter offering four weeks of post-sale charter dates to Natasha and its "invitees" (*see* Appendix B).

4. After negotiations over the dates on which the EVITA would be available to Natasha, the parties agreed by phone on June 21, 1983, that Natasha would use the boat on the following dates:

August 14–18, 1983,

August 31–September 2, 1983,

September 19–26, 1983, and

January 14–28, 1984

Natasha sent EMC a letter containing these dates. Natasha also told EMC it would use the boat itself in mid-August, but it was trying to subcharter the boat for early September.

5. Richard Imperatore, EMC's lawyer, wrote Natasha on July 11, 1983, stating the following:

 a. Natasha could not use the boat from September 19–26.

 b. Natasha could use the boat for only three weeks, not four.

 c. Natasha must make a $3,000 deposit toward "running expenses" each time it used the boat.

 d. Natasha must pay for insurance.

 e. Natasha could not subcharter the boat.

 f. Unless Natasha agreed to all of this, it could not use the boat at all.

Mr. Imperatore included with his letter three charter agreements, ready for Natasha's signature, incorporating these conditions.

6. Natasha signed the first of these charter agreements under protest and sent it to EMC on August 9, 1983. Natasha officials stated at trial that it had no choice but to sign the agreement, as it needed the boat for August 14–18.

7. EMC refused to give Natasha the boat for August 14–18; it said the crew needed a vacation.

Natasha then sued EMC. The case was tried before a federal district judge sitting in admiralty. EMC called no witnesses (but did present depositions). The court found for Natasha. The court characterized EMC's "crew needs vacation" claim as a "hoax." It found that Imperatore's "extortionate demands" of July 11 were "unwarrantedly superimposed on the transaction" and "constituted a repudiation of the time charter agreement and of the schedule of dates agreed to on June 21st." The court concluded that

> any reasonably intelligent person able to read English could not take Mr. Imperatore's letter as anything ... other than an attempt to renegotiate and rewrite the

bargain, and in the course of it, to impose considerable onerous terms upon the plaintiff. . . .

It awarded Natasha $91,254.61 in damages for EMC's breach of contract. EMC now appeals.

## II

EMC's basic claim on this appeal is that Natasha's case should have been tried before a jury. EMC recognizes that it has no right to a jury trial in admiralty. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure (Civil)* § 1313 (1969); Fed.R. Civ.P. 38(e); Advisory Committee Notes on Fed.R.Civ.P. 9(h) (no right to jury trial in admiralty suits except as provided by statute); *cf. Americana of Puerto Rico, Inc. v. Transocean Tankers Corp.*, 317 F.Supp. 798 (D.P.R.1969). So it argues that this case does not fall within admiralty's jurisdiction.

 Admiralty jurisdiction extends only to wholly maritime contracts. *The Eclipse*, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269 (1890). Contracts to *hire* a vessel are wholly maritime, *see Morewood v. Enequist*, 23 How. 491, 64 U.S. 491, 16 L.Ed. 516 (1860); G. Gilmore & C. Black, *The Law of Admiralty, supra,* § 1-10, at 22. But, contracts to *sell* a ship are not, *see The Ada*, 250 F. 194 (2d Cir.1918); *Grand Banks Fishing Co. v. Styron*, 114 F.Supp. 1 (D.Me.1953); *see generally* G. Gilmore & C. Black, *supra,* § 1-10, at 26; Note, *Admiralty Jurisdiction and Ship-Sale Contracts,* 6 Stan.L.Rev. 540 (1954). EMC says that this case involves, primarily, a contract to sell a ship; and, it adds, that fact defeats maritime jurisdiction.

The relevant rule of law, however, was set forth by this court in *Eastern Massachusetts Street Railway, supra:*

> It is undoubtedly true that, where an instrument embodies a contract containing provisions, some of which are maritime and some nonmaritime, which are so interrelated as to be indivisible and to render a separate adjustment of those that are maritime impracticable, admiralty will not take jurisdiction. But where

the respective provisions of the contract are divisible and the maritime obligations may be separately adjudicated, admiralty may take jurisdiction and enforce them. . . . "The mere fact that the contract covers a subject-matter of both kinds is not therefore decisive; that would make the mere form control. The substantial question is whether the maritime obligations can be separately enforced without prejudice to the rest."

42 F.2d at 63–64 (quoting *Compagnie Francaise de Navigation a Vapeur v. Bonasse*, 19 F.2d 777, 779 (2d Cir.) (L. Hand, J.), *cert. denied*, 275 U.S. 551, 48 S.Ct. 114, 72 L.Ed. 421 (1927) ). Federal courts have consistently applied this rule. *See e.g., Jack Neilson, Inc. v. Tug Peggy*, 428 F.2d 54 (5th Cir.1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 973, 28 L.Ed.2d 238 (1971); *Flota Maritima Browning v. The Ciudad de la Habana*, 181 F.Supp. 301, 307–10 (D.Md.1960); *Compagnie Francaise, supra.* And, the application of this rule here leads us to reject EMC's claim.

The contract's provisions governing Natasha's "charter" of the yacht seem to us, as they did to the district court, clearly separable from the rest of the sale contract. They are contained in a separate clause; they are elaborated upon in separate letters referring only to the charter. With the exception of the $1.4 million price, EMC points to nothing in the sale contract's other terms that refers to, or even sheds light upon, the charter provision. The charter provision was to be performed well after performance of all other sale terms. Indeed, as the facts that we have set out suggest, EMC's efforts to repudiate the charter provision came after all other terms in the sale contract had long since been executed. It is plain to us that "the maritime obligations [of the whole contract] can be separately enforced ... without prejudice to the rest." *Eastern Massachusetts Street Railway, supra*, at 63–64.

We have also found two roughly analogous cases—involving contracts for both charter and sale of a vessel—in which the charter of a boat preceded a sale. In those

cases, the courts found the contract's charter provisions separable from those of the sale. Because the charter terms were not intertwined with, or dependent for their implementation upon, the sale terms, admiralty jurisdiction was proper. *See Jack Neilson, Inc. v. Tug Peggy, supra; Flota Maritima Browning v. The Ciudad de la Habana, supra.* The best support EMC can muster is two cases in which courts found no separability in contracts which provided for transport of goods across both sea and land. The contracts in those cases set a single price for such transport and did not specify how to divide that price between the two (maritime and nonmaritime) portions of the trip. *Outbound Maritime Corp. v. P.T. Indonesian Consortium,* 582 F.Supp. 1136, 1142 (D.Md.1984) ("there is no measure by which the court would be able to separate out and assess the damages flowing from the alleged breach of the maritime elements of the contract"); *Alaska Barge and Transport, Inc. v. United States,* 373 F.2d 967, 972, 179 Ct.Cl. 216 (1967) (same). In this case, however, both the record below and the contract at issue make it quite clear that EMC's promise to "charter" was a separate—and easily "separable"—obligation over and above the $1.4 million cash price.

In sum, we do not accept EMC's claim of jurisdictional error. We also reject as without merit other still less substantial arguments that EMC makes on this appeal.

### III

We have examined the record in this case with some care to determine whether it is appropriate to assess a monetary penalty against EMC. *See* 28 U.S.C. § 1912; Fed. R.App.P. 38. We have decided to assess such a penalty here for two reasons. First, we believe that penalizing frivolous appeals, or those interposed for purposes of delay, may help, at least marginally, with the burden that an increasing case load has placed on the courts of appeals. The nature of this "burden" is sometimes misunderstood as if it referred to the workload of an individual judge. In fact, it refers to the general systemic problem of less judicial time to spend on each individual case. This problem may be more severe in some courts than others. But, as a general matter, the more time we spend on frivolous cases, the less time we have for the problems of more serious litigants. Thus, the "frivolous" appeal hurts other litigants and interferes with the courts' overall mission of securing justice. Of course, ironically, the extra time needed to determine whether an appeal is frivolous can steal yet more time from more serious cases. Moreover, any such penalty system must inevitably be somewhat haphazard in administration, letting slip through its net some cases that are as frivolous as those it catches. Despite these drawbacks, however, the occasional ministration of penalties may encourage self-policing by attorneys and strengthen the hand of those attorneys who would discourage clients from taking legal positions totally lacking in merit.

Second, despite the merits of the American system, under which each party must pay its own attorney, that system arguably creates incentives for two undesirable types of behavior. On the one hand, it may encourage plaintiffs to bring "strike suits" —suits that have no legal merit but which a plaintiff hopes the defendant will settle by paying the plaintiff something less than what it would cost to defend the suit. *See generally Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966) ("strike suits" filed by parties "interested in getting quick dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to get rid of them"); Note, *Extortionate Corporate Litigation: The Strike Suit,* 34 Colum.L.Rev. 1308 (1934). On the other hand, the system may encourage a defendant, who owes money to the plaintiff, not to pay that money—or to offer to pay a reduced amount. The defendant may believe that the costs of litigation will make it uneconomic for the plaintiff to pursue collection of the full amount owed. *See Leff, Injury, Ignorance and Spite—The Dynamics of Coercive Collection,* 80 Yale L.J. 1, 5

(1970) ("Under the American law of contracts, after the other party has fully performed his obligations it is absolutely irrational for you fully to perform yours.").

The facts of this case, as found in the record, make it consistent with the latter type of problem. We use the vague words "consistent with" deliberately, for we do not know what the defendant or its attorneys actually believed at the time they breached the contract, decided to defend this suit, and filed this appeal. *See* Fed.R. Civ.P. 11 (requiring good faith basis for pleadings and authorizing use of sanctions, including payment of attorney's fee, for violation). We know only that Natasha's legal position was strong; and EMC's defense, as revealed in the record, quite weak. But we also know that the expense of bringing this suit is likely to amount to a large share of Natasha's damage recovery.

Given these circumstances, we believe it particularly appropriate to ask whether monetary penalties are warranted—a question that comes down to asking whether the appeal is frivolous or interposed for purposes of delay. Fed.R.App.P. 38 provides that "[i]f a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." Moreover, 28 U.S.C. § 1912 gives us the power to award "to the prevailing party just damages for his delay and single or double costs." Although § 1912 and Rule 38 differ slightly—the former speaking of "delay" while the latter concerns "frivolous" appeals—courts have typically ignored this distinction and imposed sanctions under the rule *and* the statute. *See, e.g., Commonwealth Electric Co. v. Woods Hole, Martha's Vineyard and Nantucket Steamship Authority*, 754 F.2d 46, 49 & n. 5 (1st Cir.1985); *Oscar Gruss & Son v. Lumbermens Mutual Casualty Co.*, 422 F.2d 1278, 1284 (2d Cir.1970); *see generally* Note, *Disincentives to Frivolous Appeals: An Evaluation of an ABA Task Force Proposal*, 64 Va.L.Rev. 605, 612 n. 43 (1978). Courts have also found both the rule and the statute to permit the award of attorney's fees under the rubric of "just damages." *See, e.g., Commonwealth Electric Co. v. Woods Hole, Martha's Vineyard and Nantucket Steamship Authority*, *supra; NLRB v. Catalina Yachts*, 679 F.2d 180, 182 (9th Cir.1982); *see* Advisory Committee Notes to Fed.R.App.P. 38.

█ In our view, EMC's appeal is frivolous. "An appeal is frivolous when the result is obvious, or the arguments are 'wholly without merit.' " *NLRB v. Catalina Yachts*, 679 F.2d at 182 (citations omitted). Here, the appeal's frivolity may not be intuitively clear to one not familiar with the field. Yet a minimal amount of research, even a cursory reading of the relevant treatises and case law, should have revealed to the appellant that its legal position fits the *Catalina Yachts* description. Because the appeal is frivolous, we need not decide whether the appeal amounted to an effort to delay.

Penalties in cases like this one are appropriate. *See, e.g., Good Hope Refineries, Inc. v. Brashear*, 588 F.2d 846, 848 (1st Cir.1978) ("While attorneys have a professional duty to represent clients zealously, they are not justified in spinning out essentially frivolous appeals for the sake of delay."); *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 74 (1st Cir.) ("Some penalty should attach to taking up our time with such a perfunctory appeal."), *cert. denied*, — U.S. —, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Commonwealth Electric Co. v. Woods Hole, Martha's Vineyard and Nantucket Steamship Authority*, 754 F.2d at 49 ("Outside-chance opportunity for a megabucks prize must cost to play."); *NLRB v. Smith & Wesson*, 424 F.2d 1072, 1073 (1st Cir.1970) (per curiam). There is precedent suggesting that we can simply assess a particular amount as damages without submissions by the parties, *Commonwealth Electric Co. v. Woods Hole, Martha's Vineyard and Nantucket Steamship Authority*, *supra*, or simply order payment of "reasonable counsel fees," *see, e.g., Local Union No. 251 v. Narragansett Improvement Co.*, 503 F.2d 309, 313 (1st Cir. 1974).

For the reasons set forth above, the judgment of the district court is *affirmed* with double costs and counsel fees in the amount of $10,000 to appellee.

## APPENDIX A

Purchaser will try to close prior to October 1st. If this is accomplished seller may have use of boat after April 15, 1983, for two weeks at a time mutually agreeable to both parties. W.E. Bosarge, Jr., to pay for normal charter expenses, i.e. food, fuel, dockage. If the purchaser is unable to close before October 1st, then the seller may have use of the boat for one month under the same conditions as above. Also purchaser will take over costs of EVITA from October 1st, 1982.

APPENDIX B

October 15, 1982

Dr. W.E. Bosarge
Natasha, Inc.
3050 S. Post Oak Blvd.
Houston, TX

Re: EVITA

Dear Dr. Bosarge:

On this date the undersigned are acquiring the oil screw yacht EVITA from Natasha, Inc. and as part of this transaction, we have agreed to extend to you and to your invitees the use of said yacht for a period of four weeks during the following designated time periods.

January 15 - 29 1983

June 18 - 25 1983

January 21 - 28 1984

While there will be no fee for the use of said yacht, you will be responsible for normal charter expenses including food, fuel, dockage, and such other expenses as are normally paid by a charter user, exclusive of charges for the boat itself, and you will execute a standard charter agreement. This letter of agreement clarifies the language contained in the Yacht Purchase and Sale Agreement made September 1, 1982, and is given for valuable consideration as part of the transaction wherein we are purchasing said yacht from you.

Very truly yours,

Purchaser

*call re: seasonal bases for dates above*

*on behalf of ELITA marine charters, inc.*