**CARY MARINE, INC.,**
Plaintiff–Appellant,

v.

**The MOTORVESSEL PAPILLON, et al., Great Lakes Cary Corporation, Donald B. McCann, Defendants and Third Party Plaintiffs–Appellees,**

**Randy Postma, Third Party Defendant.**

No. 88–3516.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 23, 1989.

Decided April 18, 1989.

William D. Carle, Ray, Robinson, Hanninen & Carle, Cleveland, Ohio, LeRoy Kramer (argued), Racine, Wash., for Cary Marine, Inc.

Donald B. McCann (argued), Cleveland, Ohio, pro se and for the Motorvessel Papillon, et al., Great Lakes Cary Corp.

Before KEITH, JONES and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiff, Cary Marine, Inc. (Cary), brings this interlocutory appeal to challenge the district court's refusal to issue a warrant to arrest the motor vessel "Papillon" pursuant to Rules C and D of the Federal Rules of Civil Procedure Supplemental Rules For Certain Admiralty and Maritime Claims, 701 F.Supp. 604. Finding admiralty jurisdiction lacking, we affirm the district court's ruling.

This case involves three agreements among three parties concerning the Papillon, a vessel currently owned by American Marine Institutes, Inc. (AMI). In the first agreement (Agreement # 1), AMI granted a charter and option to purchase the Papillon to Cary. The agreement was signed by Cary's president, the now third-party defendant, Randy Postma. Under the agreement, Cary leased the Papillon on a "bareboat charter basis"[1] from January 20, 1986, until January 20, 1988. Cary "prepaid" the charter hire by assuming AMI's

---

1. A bareboat or "demise" charter involves the transfer of full possession and control of a vessel for the duration specified in the contract. Schoenbaum, *Admiralty & Maritime Law*, 382 (1987).

existing obligation on a note to Key Financial (Key) that was secured by the Papillon. Essentially, Cary agreed to pay Key on a monthly basis and to pay AMI a $15,000 balloon payment if it exercised the purchase option. The purchase price was agreed to be the vessel's fair market value.[2] According to Agreement #1, the charter fee for the twenty-four months is $110,000 and requires a $200,000 security deposit. The agreement requires AMI's consent for any assignment or subcharter of the Papillon. The agreement also provides that Cary can exercise the purchase option only during the last thirty-one days of the agreement. Upon exercise of the option, the charter hire payments and the balance of the security deposit are to be credited to the purchase price and Cary must pay AMI the $15,000 balloon payment to acquire title to the vessel. The agreement authorizes AMI to repossess the vessel upon any default by Cary. During the summer of 1986, Cary subchartered the Papillon to Great Lakes Cary Corporation (GLCC)[3] and resumed custody of the vessel that fall.

The second agreement (Agreement #2), styled "Purchase Agreement," was executed by Randy Postma on behalf of Cary and Donald B. McCann on behalf of GLCC. Under that June 1, 1987, agreement, Cary agreed to deliver the Papillon in good and proper running condition. GLCC agreed to pay $343,012 for the vessel, in part, by assuming Cary's obligation to Key in the amount of $243,012. A balance of $101,-800, which included some miscellaneous extra costs, was to be paid on delivery of the vessel to GLCC. Fifteen thousand dollars of the $101,800 was deferred as the amount GLCC would have to pay AMI to obtain title during the specified period when AMI authorized the purchase option to be exercised. The Agreement also specified in pertinent part:

> Purchaser is assuming the charter and purchase option presently held by Associated Marine Learning [sic] Institute currently in the name of Cary Marine. This is to be accomplished within 60 days of signing these agreements. Purchaser will assume all obligations of the charter and purchase option including any charges for charter fees, taxes, or interest.
>
> Purchaser will also assume all obligations of the Key Financial mortgage.

The Papillon was tendered to GLCC on June 1, 1987, and GLCC paid Cary $86,800 (the above-mentioned $101,800 minus the $15,000 balloon payment). GLCC began making monthly payments to Key, apparently without formally assuming the obligation. GLCC ceased making these payments after three installments because of alleged defects in the vessel.

The third and final agreement (Agreement #3) executed on July 19, 1987, by AMI, Cary, and GLCC is styled "Yacht Charter and Option to Purchase Assignment." This Agreement incorporates all of the terms and conditions of Agreement #1 and renders those terms and conditions binding on GLCC. Agreement #3 and Agreement #1 explicitly note that no payment is due and owing on the charter hire, reflecting the fact that Cary had prepaid the required fees by assuming AMI's mortgage held by Key. Agreement #3 further provides for AMI's consent to the assignment of the charter agreement. GLCC agreed to undertake all of Cary's rights, duties, liabilities, and obligations under the charter such that GLCC stands in the place of Cary vis-a-vis Agreement #1. Agreement #3 also provides that if GLCC defaults on its assumed obligations under Agreement #1, Agreement #3 becomes null and void and Cary must resume its obligations under Agreement #1. Finally, Agreement #3 reflects AMI's consent to Cary's assignment of Cary's option to purchase under Agreement #1 under the same terms and conditions provided in Agreement #1. Agreement #3 then provides that upon GLCC's exercise of the

---

**2.** The fair market value of the Papillon was determined to be $325,000.

**3.** GLCC served as Cary's exclusive sales agent in the Lake Erie area. Donald McCann, president of GLCC, is also an attorney and is representing himself and GLCC in this action.

option, the $200,000 security deposit is applicable to the purchase price and the $15,-000 balloon payment will be due. GLCC's performance under Agreement # 3 is personally guaranteed by McCann.

This cause of action accrued when GLCC failed to assume Cary's underlying indebtedness to Key and ceased making monthly payments on the note held by Key. GLCC contends that it stopped making payments because the vessel is in bad condition and because Cary refuses to cooperate with it. Cary has resumed making payments to Key while GLCC retains possession of the Papillon.

In November 1987, Cary filed a diversity action seeking, among other relief,[4] the arrest of the Papillon pursuant to a maritime lien under Rule C or to a possessory action under Rule D. The district court declined to issue an arrest warrant after determining that (1) because the alleged breach is of the purchase agreement (Agreement # 2) and not the charter agreement (Agreement # 1), Rule C, which authorizes an in rem action to enforce a maritime lien, is not applicable; (2) because Cary lacked legal title or a legal claim to possession of the Papillon, Rule D could not be invoked; and (3) arrest of the Papillon was unnecessary given McCann's assurances, as an attorney and officer of the court, that he would not "spirit the boat away, sell it, or harm it in any way." The propriety of the district court's ruling is the sole issue before us.

## I.

Cary seeks to arrest or obtain possession of the Papillon pursuant to Rule

C or Rule D. Rule C provides in pertinent part:

**Actions in Rem: Special Provisions**

(1) **When Available.** An action in rem may be brought:

(a) To enforce any maritime lien;

(b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.

Rule D provides in pertinent part:

**Possessory, Petitory, and Partition Actions**

In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, in all actions so maintainable with respect to the possession of cargo or other maritime property, and in all actions by one or more part owners against the others to obtain security for the return of the vessel from any voyage undertaken without their consent, or by one or more part owners against the others to obtain possession of the vessel for any voyage on giving security for its safe return, the process shall be by a warrant of arrest of the vessel, cargo, or other property, and by notice in the manner provided by Rule B(2) to the adverse party or parties.

If a case is subject to admiralty jurisdiction, resort to these remedies is available. In the absence of admiralty jurisdiction, however, these remedies are not available.[5] Generally, admiralty jurisdiction extends only to wholly maritime contracts. When

---

**4.** Cary also sought, in Count 11 of its complaint, in personam damages for GLCC's alleged breach of a maritime contract. GLCC counterclaimed, seeking damages for Cary's alleged breach of contract. GLCC also sought an accounting for commissions potentially due to it. These claims remain pending in the district court and are not currently before us.

**5.** Rule A of the Supplemental Rules for Certain Admiralty and Maritime Claims provides that the supplemental rules apply to the procedure in admiralty and maritime claims as defined by Fed.R.Civ.P. 9(h) regarding certain remedies including actions in rem. Rule 9(h) provides:

**Admiralty and Maritime Claims.** A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdic-

tion that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15. The reference in Title 28, U.S.C. § 1292(a)(3), to admiralty cases shall be construed to mean admiralty and maritime claims within the meaning of this subdivision (h).

determining whether a contract action is subject to admiralty jurisdiction, the subject matter of the contract is controlling. *North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 222–23, 63 L.Ed. 510 (1919); *Goodman v. 1973 26 Foot Trojan Vessel,* 859 F.2d 71, 72 (8th Cir.1988). In this case the parties concur with the widely held principle that federal admiralty jurisdiction, and thus, in rem remedies, do not extend to contracts, which, by their terms or effect, are *solely* for the sale of a vessel. That is, the breach of a contract for the sale of a vessel is not a maritime contract and does not give rise to a maritime lien. *S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160, 164 (5th Cir.1979), *cert. denied sub nom. St. Paul Mercury Ins. Co. v. East West Towing, Inc.,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). Admiralty jurisdiction is, however, properly exercised over contracts to charter a vessel. *Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 470 (1st Cir.1985). The parties here differ with respect to how their agreements should be characterized. GLCC contends that its agreements with Cary are, in actuality, purchase agreements, precluding any in rem remedies while Cary maintains that their agreements are mixed, involving both an option to purchase and a present obligation to pay consideration for the interim use and possession (i.e., charter) of the Papillon. As such, admiralty jurisdiction is not necessarily precluded. For example, a court may extend admiralty jurisdiction to the charter portion of the charter-sale contract when the charter portion of the contract is readily separable from the rest of the contract. *Natasha,* 763 F.2d at 470. In *Natasha,* the purchase agreement had a wholly separate clause containing specific charter provisions. The charter provisions were elaborated upon in a separate letter and the sales portion of the contract was silent with respect to the charter provisions. Under those circumstances, the court extended admiralty jurisdiction to the maritime (charter) obligations because those obligations could be separately enforced without prejudicing the remaining obligations.

*See also Jack Neilson, Inc. v. Tug Peggy,* 428 F.2d 54 (5th Cir.1970), *cert. denied,* 401 U.S. 955, 91 S.Ct. 973, 28 L.Ed.2d 238 (1971); *Flota Maritima Browning v. The Ciudad De La Habana,* 181 F.Supp. 301 (D.Md.1960) (admiralty jurisdiction is proper when charter terms are not intertwined with or dependent on sale terms).

■ In contrast, when a contract is primarily one for the sale of a vessel and does not contain a severable charter provision, admiralty jurisdiction is inappropriate. *Butler Seafood, Inc. v. Gowdy,* 609 F.Supp. 465 (S.D.Fla.1984). In *Butler,* the court declined to extend admiralty jurisdiction to a charter-sale agreement in which the charter term was only nine months long, the charter provisions expressly provided for the ultimate purchase of the vessel by the charteree, and the specified charter payments equalled the mortgage payments being made by the charteror. *Id.* at 466–67. The *Butler* court set forth several factors to consider in charter-sale agreements to determine whether admiralty jurisdiction is proper. These factors include "the duration of the charter provision before sale, the specific terms of the charter, and whether or not the purchase option was exercised before the dispute arose." *Id.* at 466.

■ In the present case, GLCC's June 1, 1987, contract with Cary (Agreement #2) obliges GLCC to assume Agreement #1 between Cary and AMI within sixty days. GLCC did so in Agreement #3. Agreement #2 also obliges GLCC to assume Cary's mortgage with Key. These assumptions by GLCC indicate how GLCC's purchase of the Papillon was to be effectuated. That is, GLCC had to acquire Cary's purchase option authorized by Agreement #1 in order to purchase the Papillon. Because Agreement #1 required AMI's consent to any assignment of rights granted in that agreement, it was necessary to execute Agreement #3 in order to effectuate Agreement #2. Although it is true that GLCC obliged itself to stand in Cary's stead vis-a-vis Agreement #1, GLCC's alleged breach of the parties' purchase agreement does not constitute a breach of

the charter agreement because both Agreement # 1 and Agreement # 3 explicitly indicate that no money is due or owed on the charter agreement. Moreover, neither Agreement # 1 nor # 3 makes any reference to Cary's financial obligation to Key as the source of Cary's prepayment for the charter fees or otherwise obliges GLCC to assume Cary's mortgage for the purpose of charter. The only reference to GLCC's assumption of the Key mortgage is in the purchase agreement between Cary and GLCC (Agreement # 2).

■ Even if we construed the parties' agreements as giving rise to a charter for the use and enjoyment of the vessel from June 1, 1987, when Agreement # 2 was executed, until the appropriate dates in December 1987 or January 1988, when the purchase option could be exercised, a short period of roughly six months, we find that the parties' agreements primarily were intended to, and in fact do, facilitate the ultimate sale of the vessel.[6] Any payments made by GLCC were not charter payments because no such payments were due. Rather, GLCC's payments were mortgage payments applicable to the purchase as soon as the option could be exercised (within thirty-one days prior to January 20, 1988). In fact, the obligation to make the mortgage payments extended beyond the end of the charter period. GLCC had already paid $86,800 to Cary and had no reason to agree to assume Cary's debt of some $243,000 if its intent was merely to assume Cary's charter. The fact that this dispute arose before the option was exercised is of little consequence. As of June 1, 1987, GLCC already had chartered the Papillon once and made the decision to buy it. The only obstacle to the purchase was that Agreement # 1 did not permit the option to be exercised until the last thirty-one days of the charter period.[7] In this case

the sale of the option to purchase preceded the assumption of the charter but the charter assumption was merely a conduit to effectuate the ultimate sale. Thus, notwithstanding the existence of Agreement # 3, GLCC's obligation to assume Cary's charter with AMI was articulated in and intertwined with the purchase agreement (Agreement # 2).

For these reasons, we are persuaded that even if the parties' agreements are construed as a charter-sale agreement, they are intertwined and primarily intended to effectuate the sale of the Papillon. Hence, admiralty jurisdiction is lacking. Moreover, even if, contrary to our view, the charter agreement was deemed sufficiently divisible from the purchase agreement so as to invoke admiralty jurisdiction, GLCC did not breach that agreement. Therefore, there was no maritime lien enforceable under Rule C because Cary's obligations under Agreement # 1 had already been fulfilled.

### II.

■ The district court also was correct in declining to issue a warrant for arrest of the Papillon under Rule D's provisions for a possessory action in rem. A possessory action permits a party to adjudicate the right to possession of property that has wrongfully been taken. Such actions are recognized as part of admiralty jurisdiction. *Hunt v. A Cargo of Petroleum Prods. Laden on the Steam Tanker Hilda,* 378 F.Supp. 701 (E.D.Pa.1974), *cert. denied sub nom. Hunt v. Coastal States Marketing, Inc.,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Rule D's remedy with respect to issues of possession of vessels, however, is also subject to Fed.R.Civ. P. 9(h) and, thus, requires the existence of admiralty jurisdiction. The problem in this

---

6. *See The Ada,* 250 F. 194 (2d Cir.1918) (charter-sale agreement is outside admiralty jurisdiction when charter was only for six months, the purchase price equalled the total charter payments, and charteree had notified the owner of its intent to purchase the vessel and had tendered the purchase price).

7. In its reply brief, Cary contends that GLCC has not exercised the option to purchase. In response, GLCC has produced a letter not contained in the record. The letter, dated January 4, 1988, indicates to AMI GLCC's exercise of the option and requests AMI to place the pertinent title and transfer papers in escrow. GLCC's exercise of the option occurred after Cary filed the suit giving rise to this appeal.

case, as already discussed, is that Cary's claim to the ship arises out of a breach of the purchase agreement (Agreement # 2) and not of a maritime contract. Hence, admiralty jurisdiction is lacking, rendering Rule D unavailable to Cary. *See Silver v. Sloop Silver Cloud,* 259 F.Supp. 187 (S.D. N.Y.1966) (Rule D claim arising out of agreement for construction of vessel lacked admiralty jurisdiction because vessel construction agreements are outside admiralty jurisdiction). Moreover, Cary sold its right to possession of the Papillon to GLCC in Agreement # 2. Hence, the Papillon was not wrongfully taken from Cary. Cary does not allege any right to title enforcible under Rule D as title currently remains with AMI.

For the foregoing reasons, the district court's ruling is AFFIRMED and the case shall proceed as a diversity action for breach of contract in that court.