**BAY STATE TOWING COMPANY,**
**Plaintiff, Appellee,**

v.

**BARGE AMERICAN 21 (O.N. 517472),**
**et al., Defendants, Appellants.**

**Nos. 89–1042, 89–1155 and 89–1335.**

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1990.
Decided March 30, 1990.

John J. Tabacco, Jr., with whom Jared Stamell and Stamell, Tabacco & Schager,

New York City, were on brief, for defendants, appellants.

Timothy R. McHugh, with whom Hoch & McHugh, Boston, Mass., was on brief, for plaintiff, appellee.

Before BREYER and CYR, Circuit Judges, and BOWNES, Senior Circuit Judge.

BREYER, Circuit Judge.

Bay State Towing Company, which owns a tugboat, sued New England Marine Services, which owns barges, claiming that New England owed it about $113,000 for tugboat towing for March, April, and May 1986 ($81,000 after deducting a fuel setoff of about $32,000). After a trial, the district court found that New England had no substantial defense; it awarded Bay State the $81,000 plus interest of about $19,000 (running from July 1, 1986, to the time of judgment); and it imposed a sanction against New England, amounting to $20,000 in attorneys' fees, for having filed an improper "opposition" to Bay State's summary judgment motion.

The district court noted that Rule 11 of the Federal Rules of Civil Procedure says:

> The signature of an attorney or party [on a filed paper] constitutes a certificate by the signer that the signer has read the ... paper; that to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry* it is well grounded in fact ... and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11 (emphasis added). It pointed out that the "opposition," which Jared Stamell, New England's counsel, signed, said there were four "issues of material fact," namely:

> A. Whether plaintiff's bills to defendants correctly set forth the reasonable charges for towage services actually provided to defendants....
> B. Whether plaintiff has given defendants credit for the about $250,000 paid to plaintiff....
> C. Whether plaintiff has given defendants credit for the about $45,000 in fuel sales defendants made to plaintiff....
> D. Whether plaintiff padded bills submitted to defendants in May 1986 just before starting the lawsuit.

It also pointed out that Jared Stamell's wife, Susan Frank, who is a principal officer of New England, filed an attached affidavit in which she said that she believed

> the amounts claimed for standby time, weather delays, and to move a barge from one location to another are unreasonable.

It concluded that Stamell and Frank either did not believe any of this, or would not have believed it if they had made "reasonable inquiry." The court added that Stamell and Frank had filed the "opposition" to "cause unreasonable delay."

Rule 11 also says that:

> If a ... paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Accordingly, the district court imposed a sanction consisting of a $20,000 attorney's fee.

New England appeals this sanction. We have reviewed the record. In our view, that record adequately supports the district court's determination.

I

*Liability*

In its initial June 1986 complaint, Bay State said that New England owed it $113,000 for barge towing services. New England answered, denying the liability, and added that Bay State owed it $45,000 for fuel. Bay State then filed its summary judgment motion, admitting that it owed New England $32,000 for fuel, while adding that New England *indisputably* owed

it the remaining (approximately) $81,000. (Bay State also asked for $10,500 interest.) New England's response, which we quoted above, asserted 1) billing (*i.e.*, bookkeeping) inaccuracies; 2) failure properly to credit $250,000 in payments; 3) $45,000 owed for fuel; and 4) bill padding. We have read the record to determine whether the appellants complied with Rule 11's requirement that they have a belief "formed after reasonable inquiry" that these factual claims are true. In our view, the district court acted well within its legal powers in deciding that they did not.

That the appellants did not, or should not (after reasonable inquiry) have believed the first three of the "response's" claims is demonstrated by the fact that the record, which includes pleadings, a trial transcript, a Rule 11 hearing transcript, and numerous affidavits and other documents, contains nothing to suggest why, or how, a person could have believed any such thing. The evidence shows that Bay State owed New England $32,000 for fuel, not $45,000, and there is nothing to the contrary. There is nothing to suggest that the $250,000 in payments had anything to do with the matter. There is no evidence of bookkeeper confusion or inaccuracy of invoices. Indeed, we have examined the specific invoice amounts that Bay State listed in its complaint; we have compared them with the bookkeeping invoice figures that New England conceded were accurate (*i.e.*, represented the invoice amounts) at trial; the figures are the same. There is no evidence of the bookkeeper confusion that appellants assert in their brief. The Rule 11 hearing offered the appellants an opportunity to present any additional factual information that might have led them to form a reasonable belief that the first three statements in their "response" were accurate. We can find no such additional information. The best support we can find for New England is that Mr. Stamell, at the end of the trial, asked the parties to stipulate that his wife, Susan Frank, would testify that "her books and records show reductions which were agreed to by Bay State ... in the amount of $7,981," were she present (she was having a baby at the time). But

the record indicates that the $81,000 already reflected all the reductions Bay State agreed to, and nothing in the record suggests that the $7,981 reflects an *additional* reduction, or that anyone ever thought it did. That is to say, New England nowhere clearly contended (or produced evidence supporting the contention) that Bay State had promised to reduce the $81,000 further.

The fourth factual assertion in the "response"—bill padding—is more difficult. Although New England seemed simply to abandon its first three claims, it made clear throughout the pretrial proceedings that it would make a factual defense showing that the bookkeeper's invoices did not reflect the services that New England provided, that is to say, that its bills were "padded." In addition to asserting this claim (backed by Susan Frank's affidavit) in New England's summary judgment "opposition," Mr. Stamell, seventeen months later, wrote a letter to the district court, in which he said that the "figure on defendant's books [*i.e.*, the amount owed] is about $65,000 [not $81,000], and we will show at trial that a substantial reduction to this figure is required because plaintiff padded the bills." He reiterated this statement in letters to Bay State's attorneys. He did not tell Bay State, however, just which invoices New England thought were "padded," or just why New England thought this, until the trial was under way.

The record shows that New England had no reasonable factual basis for asserting this "bill padding" claim. The trial, in July 1988, consisted mostly of testimony by Bay State's tug captain, his partner, and the bookkeeper, to the effect that they had provided the services invoiced and that the invoices were accurate. After their testimony, New England, apparently for the first time, told Bay State just which amounts it would dispute—amounts that reflected "standby" time during a fog, or while waiting for a pilot, or where it would have been cheaper to have had the tug return to its home and come back later to pick up the barge. New England's evidence consisted of testimony by an expert witness, Richard DiNapoli, who worked for

Standard Marine Services, a company affiliated with, and owned by, the mother of Peter Frank, New England's President (and Susan Frank's brother). DiNapoli said that he had read Bay State's invoices, that he had examined the tugboat's logs, that he knew the industry, and that he failed to find *in Bay State's* materials corroboration that the day in question had really been foggy, that the pilot really had been delayed, etc. Plaintiff's counsel asked for a ten minute recess. He then brought in *New England's own logs from its own towed barges* for the relevant dates (logs that he had received only a few weeks before because New England had obtained a court "protective" order that required Bay State's lawyers to go to New Jersey to inspect the barge's logs). The barge logs contained all the necessary corroboration. The barge logs showed, for example, that the day in question really had been foggy just as Bay State had said, that the pilot really had been late, and so forth. DiNapoli, after about fifteen minutes of such cross-examination, agreed that there was no argument, that Bay State was right. He added that he would not have given a contrary opinion if anyone had ever shown him New England's own barge logs, but no one ever did.

This trial record suggests that, at best, the Franks (and Mr. Stamell, who helped them draw up their affidavits) failed to make "reasonable inquiry" before claiming that the bills were "padded." Common sense bolsters that conclusion. After all, there are perfectly obvious ways for a barge company manager, in mid–1986, to determine whether or not the weather really was foggy on a particular day in May, or whether the pilot really was late on another particular day. He could simply have asked someone who was on the scene, say the barge captain, or perhaps have checked a weather report, or even have examined (then or later) the barge logs themselves. Indeed, Peter Frank, New England's president (and, according to the record, a Harvard Law School graduate) was aware that his barges kept logs and that the normal way to resolve disputes about records was (to use his words) to "go and . . . ask the individuals how it came to be that there is a difference." Yet, the record reveals no such inquiry nor any similar effort to check the facts.

Susan Frank provided another affidavit, in response to the motion for Rule 11 sanctions, in which she said that she "relied on Mr. DiNapoli and did not know he did not review the barge log books." But the district court then asked Mr. Stamell how this could be so, since Mr. DiNapoli was not involved in the case until 1988, more than eighteen months after Susan Frank filed her affidavit supporting New England's summary judgment opposition. Mr. Stamell had no answer. Susan Frank then provided yet a further affidavit, attached to a motion to reconsider the sanctions, in which she said that she "relied upon" Bill Lake, who told her that the towing company's bills "were incorrect with respect to stand-by time, weather, and other delays, and towing time." She attached an affidavit by Bill Lake, in which he simply said that he had noted on a bill "Don't know if we want to pay these bills," that he sent the note to Susan Frank, and that he had made the note because he found problems with "excessive" weather, and other, delays (he did not say what those problems were). By this time, however, the district court was certainly free to find Bill Lake's affidavit far too sketchy to show "reasonable inquiry" by Susan Frank, to wonder at Susan Frank's credibility, and to reject the "motion to reconsider sanctions" as far too little, presented far too late.

In our view, this record provides a more than adequate legal basis for the district court to find a lack of "reasonable inquiry." The record also permits a finding that the "opposition" was filed for purposes of delay. The tugboat captain, Russell Tripp, testified that Peter Frank told him that "if I wanted my money, I had to take them to Court and he was going to tie my money up for two years." Tripp's partner said that Frank had told him about the same. Peter Frank denied that he had a "conversation with Mr. Tripp where" he "told him if he stopped providing towing services he'd have to wait two years in

Court in order to get his money." But, the district court was free not to believe Frank. Regardless, the record itself, failing to show any plausible defense or good reason for believing in the existence of such a defense or even any good reason for believing that a defense might somehow turn up, supports a finding that New England filed its opposition, forcing a trial after two years of pre-trial proceedings, primarily with the hope that delay and consequent costs would bring about compromise.

■ New England makes two final arguments about liability. It says 1) that it legitimately contested Bay State's claim for about $10,500 in interest (on the ground that not all the May bills were yet 30 days old when Bay State filed its complaint on June 3), and 2) that one cannot sanction a party for a pleading that contains frivolous claims if it also contains nonfrivolous claims. *See Townsend v. Holman Consulting Corp.*, 881 F.2d 788, 794–95 (9th Cir.) (court should look at *entire* pleading, not a single argument, to determine whether pleading is frivolous), *reh'g granted*, 888 F.2d 646 (1989). The short, conclusive answer to the first point is that the "opposition" that New England filed had nothing to do with interest; it had to do with "reasonable charges," "credit," "fuel sales," and "padded bills." (In fact, the district court awarded interest on all the invoices, but from July 1, 1986, rather than from an earlier date.) The second argument is irrelevant, for we can find nothing significant in the "opposition" that is "well grounded in fact." In any event, we do not agree that one can escape Rule 11 sanctions in respect to a document that is basically false or misleading or inadequately supported simply by pointing to a separable, minor portion of that document that meets Rule 11's requirements. *See Frantz v. U.S. Powerlifting Federation*, 836 F.2d 1063, 1067 (7th Cir.1987) ("the inclusion of one sufficient (and adequately investigated) claim does not permit counsel to file a stream of unsubstantiated claims as riders"); *cf. Burull v. First National Bank of Minneapolis*, 831 F.2d 788, 789 (8th Cir.1987) ("Whether meritless elements of a [pleading] combine to render the pleading frivolous as a whole is a 'matter for the court to determine, and this determination involves matters of judgment and degree'") (quoting *O'Connell v. Champion International Corp.*, 812 F.2d 393, 395 (8th Cir.1987)), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988).

## II

### *Amounts*

New England argues that the $20,000 attorney's fee sanction is too high. It says that it exceeds the "proportion" of the total attorney's fee that "resulted from the offensive conduct," and is greater than the amount that is "reasonable to serve the sanctioning purpose of the rule." *Eastway Construction Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). We do not agree.

■ Rule 11 does not limit the amount of a sanction to an attorney's fee or to some part of an attorney's fee. Rather, it says the sanction must be "appropriate;" and an "appropriate" sanction *"may* include an order to pay ... the amount of the *reasonable expenses* incurred because of the [improper] filing ...*, including a reasonable attorney's fee." Fed.R.Civ.P. 11 (emphasis added). The Notes of the Advisory Committee make clear that this language is deliberately broad in order to give courts the "necessary flexibility" to deal with violations of the rule. The court "has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted," all in light of the rule's "deterrent orientation." Fed.R.Civ.P. 11 advisory committee's note on 1983 amendment. In this case, we believe a rather large sanction—certainly as much as $20,-000—is "appropriate" for several reasons.

■ First, once one examines the record in detail, the violation is clear. Second, the sanctioned party is not unrepresented, or unsophisticated, or without economic power, or suffering some pressing need that either would warrant special liberality in determining what "inquiry" is "reason-

able" or special consideration in deciding what sanction is "appropriate." *Cf.* Fed.R. Civ.P. 11 advisory committee note ("when a party is not represented by counsel the absence of legal advice is an appropriate factor to be considered"). Third, the case exemplifies a potential injustice arising out of the American "attorney's fee" rule, which says that normally each party (winner as well as loser) must pay its own attorney. That system

> may encourage a defendant, who owes money to the plaintiff, not to pay that money—or to offer to pay a reduced amount. The defendant may believe that the costs of litigation will make it uneconomic for the plaintiff to pursue collection of the full amount owed. *See* Leff, *Injury, Ignorance and Spite—The Dynamics of Coercive Collection,* 80 Yale L.J. 1, 5 (1970) ("Under the American law of contracts, after the other party has fully performed his obligations it is absolutely irrational for you fully to perform yours.").

*Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 471–72 (1st Cir.1985). Rule 11 is, in part, designed to prevent the court from lending its own procedures to such injustice. Fourth, as we also pointed out in *Natasha,* even though a court-administered penalty system inevitably misses many cases warranting penalties, "the occasional ministration of penalties" when a court finds such cases "may encourage self-policing by attorneys and strengthen the hand of those attorneys who would discourage clients from taking ... positions totally lacking in merit." 763 F.2d at 471. Fifth, the record, which includes time and charge data, adequately supports the conclusion that the vast bulk of Bay State's fees were incurred after, and because of, New England's sanctionable filing. Indeed, we can find no objection filed in the district court with respect to amounts except for an affidavit in which New England says that the "fee awarded in this case should be limited to the maximum $25,-223.25 claimed by the firm Hoch & McHugh."

New England makes a final argument, implicit in its brief here, but explicit in the court below. The argument concerns legal ethics. New England, in the sanctions hearing, through its specially retained counsel, said:

> Mr. Stamell has been practicing law, your Honor, for 15 years. He is an experienced litigator who takes his obligations very, very seriously; and in the zeal to represent his defendants, he felt that he had an absolute good-faith basis —and, indeed, he did—to put forward legitimate questions of fact that were in dispute between the parties.

In essence, this statement asks us whether imposing a large sanction in this case will unreasonably discourage a lawyer from doing his utmost for his clients, an obligation that Mr. Stamell may have felt strongly since his client was also his wife. We agree that a lawyer's obligations to client and to court may sometimes seem to conflict; at least, there is potential tension between the two. Nonetheless, we believe the assessed sanction is appropriate.

For one thing, Mr. Stamell went quite far in creating the appearance of a factual controversy where none existed. For another, increased legal costs, crowded dockets, and calendar delays make the lawyer's Rule 11 obligations to the "court system" of ever greater importance. Unless, for example, the bar helps to resolve fact-based disputes without coming to court, the very costs of the court system will prevent the just resolution of those disputes. The imposition of sanctions here amounts to the shifting of costs; the loser must help to repair the damage he has caused by asserting, without "reasonable inquiry," a defense that was not "well grounded in fact."

## III

### *The Appeal*

◾ We shall award attorneys' fees on this appeal for reasons set forth in *Muthig v. Brant Point Nantucket, Inc.,* 838 F.2d 600, 607 (1st Cir.1988) (appellate court will reimburse appellate expenses incurred "because of" the sanctionable filing); *accord, Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1179 (D.C.Cir.1985).

The judgment of the district court is

*Affirmed. Costs plus $7500 attorney's fee to appellee.*